## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE (J.N.K.), an Individual | : | Case No. |
| | : | |
| Plaintiff, | : | Judge |
| | : | |
| vs. | : | |
| | : | |
| RED ROOF INNS, INC. | : | |
| Please Serve: | : | |
| Corporation Service Company | : | |
| 3366 Riverside Drive, Suite 103 | : | |
| Upper Arlington, Ohio 43221 | : | |
| | : | |
| and | : | |
| | : | |
| RRF HOLDING COMPANY, LLC | : | |
| Please Serve: | : | |
| Corporation Service Company | : | |
| 3366 Riverside Drive, Suite 103 | : | |
| Upper Arlington, Ohio 43221 | : | |
| | : | |
| and | : | |
| | : | |
| RED ROOF FRANCHISING, LLC | : | |
| Please Serve: | : | |
| Corporation Service Company | : | |
| 3366 Riverside Drive, Suite 103 | : | |
| Upper Arlington, Ohio 43221 | : | |
| | : | |
| and | : | |
| | : | |
| RRI WEST MANAGEMENT, LLC | : | |
| Please Serve: | : | |
| Capitol Corporate Services, Inc. | : | |
| 4568 Mayfield Rd, Ste 204 | : | |
| Cleveland, Ohio 44121 | : | |
| | : | |
| and | : | |
| | : | |
| MAHADEVA MADISON HEIGHTS | : | |
| HOLDINGS, LLC | : | |
| | : | |

Please Serve:                           :
Anant Patel                             :
15701 Johnson Creek Drive               :
Northville, Michigan 48168              :
                                        :
                    Defendants.         :

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (J.N.K.), by and through the undersigned counsel, and respectfully submits her original complaint for damages and makes the following averments.

## SUMMARY

1.      Jane Doe (J.N.K.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (J.N.K.), with minimal risk of detection or interruption.

8. Defendants continued supporting traffickers, including Jane Doe (J.N.K.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotels and specifically at the Red Roof Inn ("RRI") located at 32511 Concord Dr., Madison Heights, MI 48071. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9. Jane Doe (J.N.K.) is a natural person who is currently a resident and citizen of Michigan.

10. Defendant Red Roof Inns, Inc. d/b/a Red Roof Inn ("RRI Inc.") is a Delaware corporation with its principal place of business in Ohio. It can be served by its registered agent Corporation Service Company, 3366 Riverside Drive, Suite 103, Upper Arlington, OH 43221.

11.     RRF Holding Company, LLC, ("RRF Holding") is a Delaware corporation with its principal place of business in Ohio. It can be served by its registered agent: Corporation Service Company, 3366 Riverside Drive, Suite 103, Upper Arlington, OH 43221. RRF Holding is a direct subsidiary of RRI Inc.

12.     Defendant Red Roof Franchising, LLC d/b/a Red Roof Inn ("RRI Franchising") is a Delaware Limited Liability Company with its principal office in Ohio. It can be served by its registered agent Corporation Service Company, 3366 Riverside Drive, Suite 103, Upper Arlington, OH 43221. RRI Franchising is a direct subsidiary of RRF Holding Company, LLC, whose parent company is RRI Inc.

13.     Defendant RRI West Management, LLC d/b/a Red Roof Inn ("RRI West Management") is a Delaware Limited Liability Company. It can be served by its registered agent Capitol Corporate Services, Inc., 4568 Mayfield Rd, Ste 204, Cleveland, OH 44121. RRI West Management shares a common parent company with RRI Inc. RRI West Management is an affiliate of RRI Inc. and RRI Franchising.

14.     RRI Inc., RRF Holding, RRI Franchising, and RRI West Management, are referred to collectively as the "RRI Brand Defendants." Upon information and belief, they operated, controlled, and/or managed the RRI located at 32511 Concord Dr., Madison Heights, MI 4807.

15.     Defendant Mahadeva Madison Heights Holdings, LLC can be served by its registered agent Anant Patel, at 15701 Johnson Creek Dr., Northville, MI 48168. Upon information and belief, it owned, operated, controlled, and/or managed the RRI located at 32511 Concord Rd., Madison Heights, MI 48071. Mahadeva Madison Heights Holdings, LLC will be referred to herein as "Mahadeva" or "Franchisee."

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Southern District of Ohio, and all Defendants are residents of Ohio.

18.     The RRI Brand defendants have the same principal place of business, which is in New Albany, Ohio, within the Southern District of Ohio. Therefore, each is a resident of the Southern District of Ohio for the purpose of § 1391(b)(1).

19.     Under 28 U.S.C. §§ 1391(c)(2), Franchisee is a resident of Ohio for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over Franchisee.

20.     Under 28 U.S.C. §§ 1391(d), Franchisee is a resident of Ohio for the purpose of § 1391(b)(1) because if the Southern District of Ohio were a separate state, the contacts of Franchisee with the district would be sufficient to subject them to personal jurisdiction.

21.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Ohio.

22.     Each of the RRI Defendants participated in a joint venture operating the subject hotel(s) from a central location at the RRI corporate offices in New Albany, Ohio, within the Southern District of Ohio. On information and belief:

   a.  The relationship between the RRI Defendants was centered at the RRI corporate offices in the Southern District of Ohio.

   b.  The RRI Defendants signed agreements with one another related to the subject hotel(s) from RRI corporate offices in the Southern District of Ohio.

     c.    The RRI Defendant exercised joint control over operations of the subject hotels from a central location at RRI corporate offices in the Southern District of Ohio.

     d.    The RRI Defendants distributed revenue earned from the subject hotels among themselves from RRI corporate offices in the Southern District of Ohio.

     e.    The RRI Defendants developed policies for the subject hotels from RRI corporate offices in the Southern District of Ohio.

     f.    The RRI Defendants communicated with one another regarding operation of the subject hotels from RRI corporate offices in the Southern District of Ohio.

23.     Plaintiff's claims against Franchisee arise out of Franchisee's contacts with Ohio through Franchisee's relationship with the RRI Brand Defendants, which have their principal place of business in the Southern District of Ohio. Franchisee's participation in a venture with the RRI Brand Defendants operating the subject motel occurred, in substantial part, in Ohio because:

     a.    Upon information and belief, Franchisee actively sought out a franchising relationship by contacting the RRI Defendants in Ohio.

     b.    Franchisee acknowledged that the execution and acceptance of the franchising agreement occurred in the Southern District of Ohio.

     c.    The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

     d.    The franchising agreement required Franchisee to irrevocably submit itself to the jurisdiction of Ohio courts and waived all objections to personal jurisdiction and service of process.

     e.    The franchising agreement required Franchisee to report information to the RRI Defendants in Ohio, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims.

     f.    Franchisee agreed to submit all notices required under the franchising agreement to the RRI Brand Defendants in the Southern District of Ohio.

     g.    Franchisee was required to attend training and meetings in Ohio.

     h.    The RRI Brand Defendants dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio.

i.  Franchisee Defendants had an ongoing obligation to participate in centralized programs operated by the RRI Brand Defendants from their principal place of business in the Southern District of Ohio.

j.  Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by the RRI Brand Defendants from their principal place of business in Ohio.

k.  Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by the RRI Brand Defendants in Ohio.

l.  The benefit that Franchisee received from room rentals was governed by the Ohio franchising agreement.

m.  Franchisee agreed to make all payments due under the franchising agreement at the RRI principal place of business in the Southern District of Ohio.

n.  Franchisee's operation of the subject RRI was controlled and/or influenced by many policies set and enforced by the RRI Brand Defendants from their principal place of business in Ohio. Including those policies specifically related to prostitution, commercial sex, human and sex trafficking.

## FACTS

**I.  Jane Doe (J.N.K.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

24.  Jane Doe (J.N.K.)'s trafficking began around 2013. She had multiple traffickers in the years she was trafficked. Her traffickers controlled her through physical violence and force and made her engage in commercial sex acts for their financial benefit. Her traffickers posted ads of her online without her consent. She did not want to engage in commercial sex acts but when she tried to leave, her trafficker threatened and beat her. She was not allowed to keep any of the money she made, and her trafficker kept her under constant surveillance.

25.  Jane Doe (J.N.K.) was repeatedly trafficked in Defendants' hotel and each Defendant facilitated her trafficking.

26.     During Jane Doe (J.N.K.)'s trafficking period, there were two types of RRI properties: corporate properties operated by corporate affiliates and franchised properties owned by third-party franchisees and operated in conjunction with RRI affiliates and as agents of RRI affiliates.

27.     Between 2013 and January 31, 2014, Jane Doe (J.N.K.) was trafficked at the RRI located at 32511 Concord Dr., Madison Heights, MI 48071 ("Concord RRI").

28.     The Concord RRI was a franchised property. At all relevant times it was owned by Mahadeva, an entity that is not an RRI corporate affiliate, who entered a franchising agreement with the RRI Brand Defendants. Upon information and belief, Mahadeva provided "boots on the ground" at the Concord RRI, and the RRI Brand Defendants were directly involved in and exercised day-to-day control over operations of the Concord RRI, including aspects of operations that facilitated J.N.K.'s trafficking.

29.     Jane Doe (J.N.K.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the subject RRI including effects on J.N.K.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that J.N.K. was being continually subjected to coercion, control, and exploitation.

30.     Jane Doe (J.N.K.) remained under the continuous control of her traffickers through at least 2016.

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

31.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (J.N.K.).

32.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of the commercial exploitation of children.[7]

33.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

34.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT,

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

35.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf
[9] *See Id.*

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

36. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

37. The RRI Defendants knew commonly occurring signs of illegal activity associated with sex trafficking. For example, no later than 2010, RRI advised hotel management that staff should constantly be on the lookout for unusual or irregular activity on the property, including multiple guests arriving/leaving a guestroom for short durations of time or a pimp or partner who sits in the lobby or a vehicle while online setting up prostitution appointments for a property. The policy also identified signs that housekeeping staff should look for when entering guest rooms, which were consistent with the recognized "red flags" of trafficking in the hotel industry.

38. The RRI Defendants knew and communicated to franchisees and hotel management that trafficking was often associated with other criminal activity, including illegal drugs and assaults.

39. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

40.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

41.     Red Roof Inn believed that pimps should be treated as synonymous with traffickers and understood that the presence of pimps at a hotel property was an indication of sex trafficking at the property.

42.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

43.     The most effective weapon against sexual exploitation and human trafficking is education and training.[13]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number

---

[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[12] *Id.*
[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

44.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

45.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

46.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

**III.     Sex Trafficking Has Long Been Prevalent at RRI Branded Properties, and Defendants Have Known About It.**

47.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane

---

[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

Doe (J.N.K.)'s trafficking, that sex trafficking was ongoing and widespread at RRI branded properties including the subject property.

48.     Use of RRI branded properties for sex trafficking is well known to the Defendants. RRI hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[16]

49.     Unfortunately for Jane Doe (J.N.K.), Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (J.N.K.).

**a. Sex Trafficking at RRI Branded Hotels was well Known by Defendants.**

50.     Upon information and belief, each of the Defendants monitored criminal activity occurring at RRI branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (J.N.K.) was trafficked.

51.     Scores of news stories from across the US highlight RRI Brand Defendants' facilitation of sex trafficking and certainly establishes that Defendants knew, or should have known, of the use of RRI branded hotels for sex trafficking.

52.     By way of example, the Woburn, Massachusetts Daily Times reported as early as February 2000 that its Red Roof Inn was facing closure by the city licensing commission as a result of pervasive criminal activity, prostitution and sex trafficking. [17] Such criminal conduct continued

---

[16] https://traffickinginstitute.org/wp-content/uploads/2022/01/2018-Federal-Human-Trafficking-Report-Low-Res.pdf; https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf
[17]https://woburnpubliclibrary.org/wp-content/uploads/2019/03/Woburn-Daily-Times-1904-1980-Non-consecutive-1995-2014.pdf 1

unabated until at least 2012, when Vice President of Operations for Red Roof Inn, Joesph Maddux was forced to appear before the Licensing Commission. Responding to reports of dangerous men using prostitutes as young as fourteen (14) at the Woburn Red Roof Inn and 118 police reports from 2011 alone, Maddux assured the Licensing Commission that Red Roof Inn's President and legal department had been updated and outlined some of the steps the company was considering to address criminal activity including prostitution at its branded properties: [18]

- Installation and prominent display of new security systems providing 24-hour monitoring;

- Institution of nation-wide changes to its registration policies and the information obtained at check-in;

- Increased physical security of the Red Roof Inn location;

- Elimination of smoking floor(s); and

- Hotel upgrades and price increases to price rooms beyond the criminal clientele.

Sadly, there is no evidence that any such steps were taken in Woburn or across the country. Ten years later, in July 2020, the Woburn License Commission again instituted action against the Red Roof Inn location following over 150 police incident reports including those for "human trafficking, prostitution and drugs…"[19]

53.     Information that has become public through news stories establishes the entrenched and pervasive nature of RRI's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of RRI branded hotels for illegal activity, the following was noted:

- In 2010, a man and woman appeared in court on charges of trafficking a 14-year-old Milwaukee girl at a Red Roof Inn in Oak Creek, Wisconsin. At the Red Roof

---

[18] http://homenewshere.com/daily_times_chronicle/news/woburn/article_99cddca6-5983-11e1-8393-0019bb2963f4.html

[19] https://woburnma.gov/wp-content/uploads/2020/08/7-23-20-License-Commission-minutes.pdf

Inn, the traffickers gave the girl marijuana to smoke and then took pictures of her naked, which were put on a local website.[20]

- In 2010, 2 were charged with transporting a minor to engage in prostitution after a 17-year-old California runaway was trafficked at Red Roof Inn locations in New York and Maryland.[21]

- In 2012, a Pennsylvania man was indicted by a federal grand jury on charges of sex trafficking involving a 16-year-old girl who was trafficked at a New Jersey Red Roof Inn in May 2012.[22] In 2014 he was sentenced to 10 years in federal prison.[23]

- In 2012, a Minneapolis police officer investigating juvenile sex trafficking activity spotted an ad on the website Backpage.com that depicted the image of a provocatively dressed young woman offering "unrushed service, full of pleasure." The officer called the number on the ad and spoke with a female who said she was at the Red Roof Inn in Woodbury.[24]

- In 2012, a Rochester man and woman were charged in a sex trafficking case of a minor. Investigators determined that two customers paid to have sex with the victim and the woman arrested at the Red Roof Inn.[25]

- In 2012, two teenage girls were human trafficking victims at a RRI in Charlotte, North Carolina. In subsequent interviews with other human trafficking victims, they alleged their pimps would pay RRI managers and maids to not report illegal activities.[26] RRI eventually pulled its brand from the hotel. [27]

- In 2013, a 50-year-old man was charged with prostitution and human trafficking, for forcing a woman to perform sex acts against her will at the Red Roof Inn on Eisenhower Boulevard in Pennsylvania.[28]

---

[20] John Diedrich, *2 face federal sex-trafficking charges*, Milwaukee Journal Sentinel (June 16, 2010), https://archive.jsonline.com/news/crime/96508359.html/

[21] https://www.washingtonexaminer.com/teen-prostituted-held-against-her-will-in-md-and-va-hotels-feds-say

[22] Press Release, The Federal Bureau of Investigation, Pennsylvania Man Charged with Sex Trafficking of a Minor (June 27, 2012), https://archives.fbi.gov/archives/newark/press-releases/2012/pennsylvania-man-charged-with-sex-trafficking-of-a-minor

[23] Michaelangelo Conte, *Man charged with sex trafficking a teen he met in Secaucus takes plea*, nj.com (Mar. 28, 2014), https://www.nj.com/hudson/2014/03/man_originally_charged_with_sex_trafficking_a_16-year-old_he_met_in_secaucus_takes_a_plea.html.

[24] Mike Longaecker, *Police: Sex trafficking victim turns up at Woodbury hotel*, Republican Eagle (August 17, 2012), https://www.republicaneagle.com/news/public_safety/police-sex-trafficking-victim-turns-up-at-woodbury-hotel/article_88eac778-73b4-50cb-ac65-182279d50948.html

[25] Department of Justice, *ROCHESTER MAN AND WOMAN CHARGED IN SEX TRAFFICKING CASE* (Dec. 14, 2012), https://www.justice.gov/archive/usao/nyw/2012/TwoCharged.pdf

[26] *FBI investigating teen human trafficking at Charlotte hotel*, WBTV3 (Sept. 17, 2015), https://www.wbtv.com/story/30058536/fbi-investigating-teen-human-trafficking-at-charlotte-hotel/.

[27] *Id.*

[28] Brittany Miller, *Man charged in prostitution ring headed to Dauphin County court*, Penn Live Patriot News(October 9, 2013), https://www.pennlive.com/midstate/2013/10/post_625.html

- In 2013, a local news station investigated a Florida Red Roof Inn because of the high volume of search warrants that continued to pop up for the hotel, including multiple warrants that reported a high volume of prostitution activity at the hotel.[29]

- In 2013, a Lubbock grand jury indicted four suspects arrested during a prostitution sting. Police discovered two underage victims during their sting operation at the Red Roof Inn.[30]

- The Knox County Sheriff's Office arrested a Knoxville man for human trafficking at a Red Roof Inn in 2013.[31]

- In 2014, a Cincinnati man plead guilty in U.S District Court to locking up women in his Avondale home, then driving them to Red Roof Inn in Louisville where he forced them into prostitution.[32]

- In 2014, a Rhode Island man pled guilty to attempted sex trafficking after he was accused of trying to procure customers to have sex with a 23-year-old woman in the Red Roof Inn on Wolf Road on Aug. 22, 2012.[33]

- In 2014 a man was arrested by the FBI in Orlando for holding a 15-year-old girl in a Phoenix RRI and selling her for sex. He was later sentenced to 8 years in prison.[34]

- A Mississippi man was arrested in 2014 on human trafficking charges for trafficking a 16-year-old out of a Red Roof Inn in Madison County. He later pled guilty to human trafficking and was sentenced to 25 years in prison.[35]

- In 2015, police arrested 15 men in a sex-with-minors sting at a Red Roof Inn in Woodbury, Wisconsin.[36] The investigation started in 2014 when a man was arrested at the RRI after responding to a Craigslist ad for sex with a 32-year-old and fondling of her deaf daughter.[37]

---

[29] https://www.abcactionnews.com/news/motel-frequently-involved-in-criminal-activity-sees-more-than-200-calls-for-service-this-year

[30] *4 indicted on prostitution charges after Red Roof Inn sting*, KCBD News 11 (August 28, 2013), https://www.kcbd.com/story/23272377/4-charged-with-prostitution-offenses-after-red-roof-inn-sting/

[31] https://www.endslaverytn.org/news/knoxville-man-faces-human-trafficking-charges-newsarticle

[32] *https://www.fox19.com/story/27390036/avondale-man-pleads-guilty-to-sex-trafficking-in-louisville/.*

[33] https://www.timesunion.com/local/article/Sex-traffic-case-ends-in-plea-5440052.php

[34] Jamee Lind, *Phoenix man gets 8 years for selling teen for sex*, The Republic (Mar. 30, 2015), https://www.azcentral.com/story/news/local/phoenix/2015/03/30/phoenix-man-sex-trafficking-sentence-abrk/70691190/.

[35] Mary Grace Eppes, *Man sentenced for human trafficking in Madison Co.*, WLBT3 (Jan. 15, 2015), https://www.wlbt.com/story/27862158/man-sentenced-for-human-trafficking-in-madison-co/.

[36] Mathias Baden, *UPDATE: Police arrest 15 men in sex-with-minors sting at Red Roof Inn*, Republican Eagle (Sept. 23, 2015), https://www.republicaneagle.com/news/public_safety/update-police-arrest-15-men-in-sex-with-minors-sting-at-red-roof-inn/article_e48299f7-e13d-5c86-8e9f-f7faf22a8998.html.

[37] *Id.*

- In 2016, 2 were charged with human trafficking involving a minor following their arrest at a Red Roof Inn in Louisville, Kentucky.[38]

- In 2016, 2 were charged in a human trafficking scheme after police arrested them at a Red Roof Inn in Jessup, Maryland.[39]

- In 2016, 2 were arrested in New Jersey and accused of running an interstate human trafficking ring out of a Red Roof Inn in Lawrence.[40]

- In 2016, a man was sentenced to ten years for trafficking a 15-year-old girl at two motels, including a Red Roof Inn in Enfield, Connecticut.[41]

- In 2016, a man was sentenced for trafficking a minor at a Red Roof Inn in Rochester, New York for an eight-month period in 2012.[42]

- In 2016, two were arrested on human trafficking charges for forcing a woman into prostitution at an Indiana Red Roof Inn.[43]

- In 2016, a man was sentenced on human trafficking charges after forcing a woman into prostitution at hotels, including a Red Roof Inn in Massachusetts.[44]

- In 2016, arrests were made after investigation of a human trafficking operation operating out of hotels, including a Red Roof Inn in Illinois.[45]

- In 2016, three were arrested on prostitution charges at a Red Roof Inn in Kentucky.[46]

- In 2017, a man was charged with sex trafficking victims at a Red Roof Inn in Missouri.[47]

---

[38] https://www.wave3.com/story/31910401/2-charged-with-human-trafficking-involving-juvenile
[39] https://www.wbaltv.com/article/2-men-charged-in-howard-county-human-trafficking-scheme/7148473#
[40] https://www.trentonian.com/2016/09/01/new-york-man-accused-in-lawrence-sex-rings-boasts-about-600k-manhattan-home/
[41] https://www.courant.com/2016/11/14/hartford-man-sentenced-to-prison-for-sex-trafficking-of-15-year-old-girl/
[42] https://www.democratandchronicle.com/story/news/2016/01/14/rochester-man-sentenced-sex-trafficking/78770804/
[43] https://www.jconline.com/story/news/crime/2016/12/29/court-docs-alleged-pimps-paid-victim-heroin/95952012/
[44] https://www.newburyportnews.com/news/man-gets-5-to-8-years-in-prison-for-human-trafficking/article_79f32b03-3e96-5360-af02-76c53e249dec.html
[45] https://www.shawlocal.com/2016/01/18/joliet-hotel-among-meeting-places-in-rappers-sex-trafficking-ring/alh59bo/
[46] https://www.wdrb.com/news/crime-reports/louisville-police-arrest-three-during-undercover-prostitution-investigation/article_12b5448c-2857-5b6b-ba04-0aba80d5b5da.html
[47] https://www.stltoday.com/news/local/crime-and-courts/man-charged-with-sex-trafficking-at-red-roof-inn-in-st-louis/article_4c70ac45-ac34-5d28-bd3c-92efde095381.html

- In 2017, there were six arrests following a prostitution bust at a Red Rood Inn in Ohio.[48]

- In 2017, a man pled guilty to sex trafficking a 14-year-old girl at a Red Roof Inn in Kentucky.[49]

- In 2017, twenty-three people were arrested in a human trafficking investigation for trafficking eight girls, between the ages of 14 and 17, at Stockton, California hotels, including the Red Roof Inn.[50]

- In 2017, two were arrested for sex trafficking children, including at a Red Roof Inn in Ohio.[51]

- In 2018, two men were indicted on charges of child sex trafficking after a 15-year-old girl was found at a Red Roof Inn in Delaware.[52]

- In 2018, two were charged for running a sex trafficking operation out of an Illinois Red Roof Inn.[53]

- In 2018, a Virginia court upheld a defendant's conviction for sex-trafficking offenses related out of trafficking that occurred at a Virginia Red Roof Inn.[54]

54.     Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of RRI branded properties.

55.     Upon information and belief, each Defendant monitored criminal activity occurring at RRI branded hotels and thus was aware of these incidents and many similar incidents at RRI properties around the country.

56.     Upon information and belief, upper-level executives of the RRI Brand Defendants monitored news stories and law-enforcement reports regarding criminal activity at RRI branded

---

[48] https://www.news5cleveland.com/news/local-news/oh-summit/prostitution-bust-summit-co-investigators-fbi-arrest-six-at-springfield-township-red-roof-inn
[49] https://www.courier-journal.com/story/news/crime/2017/06/07/louisville-man-pleads-guilty-sex-trafficking-14-year-old/377971001/
[50] https://www.kcra.com/article/23-arrested-in-san-joaquin-county-human-trafficking/9588063
[51] https://www.cbs58.com/news/two-pastors-arrested-for-sex-trafficking-children
[52] https://www.acenewstoday.com/two-delaware-men-indicted-on-charges-of-child-sex-trafficking/
[53] https://www.wcia.com/news/local-news/two-people-face-charges-for-involvement-in-trafficking-ring/
[54] https://caselaw.findlaw.com/court/va-court-of-appeals/1944156.html

hotels. Upon information and belief, the public relations department for the RRI Brand Defendants would circulate communications discussing criminal activity, including human trafficking and prostitution, at RRI branded properties.

57.     No later than 2013, the RRI Brand Defendants began carefully monitoring online reviews and other customer feedback for RRI branded properties. Indeed, top leadership of the RRI Brand Defendants was "obsessed" with review of customer feedback, including online reviews.[55]

58.     Leadership of the RRI Brand Defendants would receive compiled reviews from Reputology, an online-review aggregator, that compiled reviews for Red Roof Inns all over the country, including the subject locations.[56] RRI Brand Defendants responded to directly or required other Defendants to respond to reviews posted on review websites.

59.     Based on information and belief, the Defendants managed and monitored on-line reviews of RRI hotel locations including the following sample:

- 2007 Tripadvisor review from New Jersey states "This place is a horrible hotel. First, I check in, drop off my luggage, and go get something to eat. I come back to find my room wide open, so I go to the front desk to report it, where i get the "Well, maybe you didnt close the door" and "I'm the only one here, so". The next night, a local prostitute moved in next door and started peddling her wares, so there was traffic all night, and even worse, she was a screamer. So I go to the front desk to report this, where I find the attendant asleep. Don't waste your money here."[57]

- 2008 Expedia review out of California states "Prostitutes were in the local area and were using this hotel for their "business meetings"." [58]

- 2008 Tripadvisor review in Pennsylvania states "This place is not only dirty but it is unsafe. The women of this town must use this hotel as hunting ground. The drug dealers are happy to see anyone check in because the think it is an instant sale. Cops swarm the parking lot continuously. Men walk the halls all hours of the day and

---

[55]  https://www.usatoday.com/story/travel/hotels/2013/04/05/red-roof-hotel-outlets/2056817/

[56] https://www.e-marketingassociates.com/blog/use-the-new-hootsuite-reputology-app-to-monitor-online-reviews

[57] https://www.tripadvisor.com/Hotel_Review-g46649-d223813-Reviews-Red_Roof_Inn_Mt_Laurel-Mount_Laurel_New_Jersey.html

[58] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews

night looking for drugs. Hookers walk the halls looking for their next guy. One hooker by the name of "Kimmy" approached my husband and wanted him to pay for sex with her when he refused she with with the next available guy. About 2 in the morning she is knocking on our door asking for my husband and wanted him to go party with him. I kicked "Kimmy" out and called the desk. They did nothing. Are the getting a pay off from the drug dealers and hookers?"[59]

- 2008 Expedia review from Ohio states "…To top it off, I am fairly convinced I saw several prostitutes staying there offering thier services to the ODOT workers who were also guests….."[60]

- 2008 Tripadvisor review from Washington states "Hookers passed out in the hall, bathrooms that flooded, topped off by the SWAT team bursting in down the hall at 2 am. This hotel was so dangerous that we complained about the drunk We didn't even have our luggage out of the rental car before two guys got in a screaming fight and ran right past us. It got better a few hours later when a hooker passed out in the hall in front of the room next door and our sleep was interrupted when the SeatTac SWAT team arrived after a dispute between a lady of the evening and a hotel guest that involved a weapon. . . . This is a DANGEROUS place to stay and there is a reason it is cheaper then the other hotels on the same street."[61]

- 2010 Tripadvisor review from Virginia states "For the price you pay, this motel is on of the worst i have seen in this area…What you do get is hallways smelling like marijoana and othe illegall drugs. prostitutes renting rooms, drug dealers hanging around the motel, etc. I can't believe that fairfax county police are not aware of these activities. Stay away from this motel if you don't like to expose yourself and your family to such activities mentioned above." [62]

- 2010 Tripadvisor review from South Carolina states "The website lies to you. Nothing but pimps and hookers at this hotel. Had a drunk person knock on our door at 2am then the phone rings someone asking for a woman. No toliet paper. Room was dirty. Never again will I use this hotel chain again."[63]

- 2010 Expedia review from California states "We stayed only a few hours. We think this place was being used for a weekend drug and prostitution house, way to many people in and out. Lots of noise and yelling."[64]

---

[59] https://www.tripadvisor.com/Hotel_Review-g30029-d96250-Reviews-Red_Roof_Inn_Allentown_Airport-Allentown_Pennsylvania.html
[60] https://www.expedia.com/Cincinnati-Hotels-Red-Roof-Inn-Cincinnati-Northeast-Blue-Ash.h17551.Hotel-Reviews
[61] https://www.tripadvisor.com/Hotel_Review-g58732-d217798-Reviews-Red_Roof_Inn_Seattle_Airport_SEATAC-SeaTac_Washington.html
[62] https://www.tripadvisor.com/Hotel_Review-g58202-d243757-Reviews-Motel_6_Washington_DC_SW_Springfield-Springfield_Fairfax_County_Virginia.html
[63] https://www.tripadvisor.com/Hotel_Review-g54258-d227066-Reviews-Red_Roof_Inn_Greenville-Greenville_South_Carolina.html
[64] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews

- 2011 Yelp review out of Maryland states " This place was close to Washington and we stayed there 5 years ago. How the times have changed, The place reeked of pot smoke and there were hookers in and out of the rooms all night. It must have become some sort of welfare home because families were living there. My second and last night I was woken up by the pimp next door screaming at his girl for not making enough money, he needed to pay for the room and feed her F*^&ing kid who cried in the background. No place to eat near hotel except a Dominos type pizza place and a Chinese restaurant that the Maryland board of health has yet to discover.. On a bright note, no one in our group was killed, maybe because of the constant police presence in the parking lot. DO NOT STAY HERE."[65]

- 2011 Tripadvisor review from Kentucky states "We stayed here a few days ago and the young man working the desk was very unprofessional. The whole look of the property was dismal. I am sure it's safe to say that drug dealers and hookers make this their home base. We will never stay at this place again!"[66]

- 2012 TripAdvisor review out of Wisconsin states "I have stayed at this hotel twice a year for nearly 10 years and have never been as disappointed in the hotel as I was this time. It wasn't the room....the room was great....redone....comfy bed....clean. However, the PROBLEM was the other guests. There was a party going on above us with people yelling & cussing all night long. We complained to the front desk and nothing was done. Several suspect prostitutes were coming and going at all hours. The parking lot was LITTERED with strange things such as wigs, beer cans, and condoms."[67]

- 2012 Tripadvisor review from Texas states "I stayed here for a week and it was a miserable experience. The room was ok but the thugs that frequent the property made for an uneasy time. There were drug deals, prostitutes, and gang type activity on the property. There were a few thugs that tried to intimidate me and I never felt safe the whole time I was staying there. Trust me... Look elsewhere."[68]

- 2012 Tripadvisor review from Michigan states "ABSOLUTELY NEVER STAY HERE - drug dealing and prostitution rife at hotel."[69]

- 2013 Tripadvisor review from California states "…Because of our road trip we didn't arrive until 10 pm that night when we arrived there were about 5 prostitutes

[65] https://www.yelp.com/biz/red-roof-inn-washington-dc-laurel-laurel
[66] https://www.tripadvisor.com/Hotel_Review-g39604-d224889-Reviews-Red_Roof_Inn_Louisville_Expo_Airport-Louisville_Kentucky.html
[67] https://www.tripadvisor.com/Hotel_Review-g60149-d123051-Reviews-Red_Roof_Inn_Milwaukee_Airport-Oak_Creek_Wisconsin.html
[68] https://www.tripadvisor.com/Hotel_Review-g56003-d223173-Reviews-Red_Roof_Inn_Houston_Westchase-Houston_Texas.html
[69] https://www.tripadvisor.com/Hotel_Review-g42207-d235115-Reviews-Red_Roof_Inn_Flint_Bishop_Airport-Flint_Michigan.html

outside with pimps. We were so frightened we drove around for 30 minutes trying to cancel our stay and because it was after 6 pm they wouldn't allow us to cancel. I'm positive the owner has some sort of deal with the drug dealers and pimps there is no way he doesn't know this is going on. They don't even try to hide it!...''[70]

- 2013 Tripadvisor review from Mississippi states "...If you are looking to have a beer with any of the vaqueros standing on each corner of the motel at all hours of day or night, this is the place for you. If you wish easy access to a prostitute down the hall, this is the place for you. If you desire a tattoo from the guy next door who just got out of prison, this is the place for you..."[71]

- 2013 Tripadvisor review from North Carolina states "Stayed here this past weekend and had to change rooms 3 times. The inappropiate activites at this hotel were horendous. Prostitutes, dogs everywhere, drug deals and a fight in the parking lot. Would never stay again."[72]

- 2013 Yelp review from Virginia states "Honestly i would have given a 1 star but i have to give an extra star for the honesty of the woman there who adamantly admitted that there are lots of prostitutes that stay there.hey at least she was honest about it."[73]

- 2013 Tripadvisor review from Florida states "....The corporate office, regional, and general managers WILL be receiving very detailed letters INCLUDING information pertaining to the police department being called because of drug activity AND CONCUBINES/PROSTITUTES as well as the PEDDLERS asking hotel guests for money. THE WORST HOTEL IVE EVER STAYED AT."[74]

- 2014 Tripadvisor review from Oklahoma states ".... Random meth heads, hookers, and undesirables roaming the property ALL night. Literally all night."[75]

- 2014 Expedia review from Ohio states "...also prostitution going on every dang night along with drug deals in parking lot..."[76]

---

[70] https://www.tripadvisor.co/Hotel_Review-g33130-d231069-Reviews-Red_Roof_Inn_Stockton-Stockton_California.html
[71] https://www.tripadvisor.com/Hotel_Review-g43833-d225211-Reviews-Red_Roof_Inn_Jackson_Downtown_Fairgrounds-Jackson_Mississippi.html
[72] https://www.tripadvisor.com/Hotel_Review-g49673-d94900-Reviews-Red_Roof_Inn_Wilmington_NC-Wilmington_North_Carolina.html
[73] https://www.yelp.com/biz/red-roof-plus-washington-dc-alexandria-alexandria-2
[74] https://www.tripadvisor.com/Hotel_Review-g34550-d226822-Reviews-or40-Red_Roof_Inn_Pensacola_I_10_at_Davis_Highway-Pensacola_Florida.html
[75] https://www.tripadvisor.com/Hotel_Review-g51560-d224966-i80249747-Red_Roof_Inn_Oklahoma_City_Airport-Oklahoma_City_Oklahoma.html
[76] https://www.expedia.com/Columbus-Hotels-Red-Roof-Inn-Columbus-Ohio-State-Fairgrounds.h450037.Hotel-Reviews

- 2014 Expedia review from North Carolina states "Great place if you need a hooker or drugs. Never again. Pimps running there girls in and out all night. Two domestic disputes during the night. Got no sleep."[77]

- 2014 Expedia review from California states "It was like out of a movie with all the hookers, and pimps out front. . . ."[78]

- 2014 Expedia review from North Carolina states "No security at this Hotel, and there was a lot of traffic coming in and out of the parking lot all hours of the evening. A lot of undesirables hanging around, pimps and drug dealers. There are some whom set up a porch by their doors indicating that they are living there for extended stays."[79]

- 2015 Tripadvisor review from Missouri "The scariest of all was definitely when I came across a scene of what appeared a prostitute kneeling and crying in the parking lot while a pimp was yelling at her. Management should look into that."[80]

- 2016 Expedia review from Ohio states "Absolutely terrible. Drugs everywhere, prostitutes. Just not a good hotel."[81]

- 2016 Tripadvisor review from Virginia states "…Prostitutes work out of this hotel. I would never stay here again."[82]

- 2016 review from Ohio states "Hookers everywhere…not a safe place to bring the wife & kids that's for sure."[83]

- 2015 Yelp review from Ohio states "They give pimps discounts and the strippers from Christie's cabaret stay here almost exclusively. So there is a lot of drug activity and whores."[84]

- 2016 review from Tripadvisor from Texas states "I have to imagine it would be a very reasonably priced casual encounter as well... Let's just say that the pimps were easy to ID and the women standing in the doorways with almost nothing on reminded me of a visit to Amsterdam in my youth. The room was nice enough, but

---

[77] https://www.expedia.com/Wilmington-Hotels-Red-Roof-Inn-Wilmington.h14416.Hotel-Reviews
[78] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews
[79] https://www.tripadvisor.com/Hotel_Review-g49673-d94900-Reviews-Red_Roof_Inn_Wilmington_NC-Wilmington_North_Carolina.html
[80] https://www.tripadvisor.com/Hotel_Review-g44881-d224932-Reviews-or10-Red_Roof_Inn_Plus_St_Louis_Forest_Park_Hampton_Avenue-Saint_Louis_Missouri.html
[81] https://www.expedia.com/Dayton-Hotels-Red-Roof-Inn-Dayton-North-Airport.h10480.Hotel-Reviews
[82] https://www.tripadvisor.com/Hotel_Review-g58277-d225059-Reviews-Red_Roof_Inn_Virginia_Beach-Virginia_Beach_Virginia.html#REVIEWS
[83] https://www.expedia.com/Dayton-Hotels-Red-Roof-Inn-Dayton-North-Airport.h10480.Hotel-Reviews
[84] https://www.yelp.com/biz/red-roof-inn-canton-north-canton-2

this is quite possibly the most sketchy neighborhood I've ever had a hotel in outside of Europe's Redlight districts."[85]

- 2017 Expedia review from Ohio states "…we checked in early at like 3 pm, but when the sun went down omg !! all the prostitutes started showing up! I was so embarrassed having to explain to my 6 year old daughter why these women were dressed that way!!!"[86]

- 2017 Google review from Ohio states "There are prostitutes in this hotel. A pimp was outside bleeding. Police were called. He was shot."[87]

- 2017 Tripadvisor review from Texas states "Two words - NEVER AGAIN! During check in we were skipped for a 2 hour prostitution sale, her pimp propositioned my husband and son in the parking lot for drugs and sale of prostitution. We did not feel safe nor comfortable the entire 2 days we were there."

- 2018 Expedia review from Ohio states "…There were also at least 2 hookers walking around soliciting. We also watched/heard 2 men argue outside, to the point I was afraid someone was going to end up hurt…"[88]

- 2019 Yelp review from Ohio states "…The hotel/motel really, it became obvious this was a live in hotel for some which happens, but it became apparent there was prostitution happening here and it was very very unnerving I was more concerned of the persons moving about the hotel at no discretion of the place . The hotel had more shady people milling about no security. There were unsavory things going's on "hired persons" if you will…"[89]

- 2019 Expedia review from Ohio state "Cons: Omg! Prostitution happening here. Prostitutes hanging out of their doors even solicited a family member. Shady people. Banging on doors middle of the night. This is what you get for the price…"[90]

---

[85] https://www.tripadvisor.com.au/Hotel_Review-g56003-d1577352-Reviews-or40-Red_Roof_Inn_Houston_North_FM1960_I_45-Houston_Texas.html
[86] https://www.expedia.com/Columbus-Hotels-Red-Roof-Inn-Columbus-East-Reynoldsburg.h20658.Hotel-Reviews
[87] https://www.google.com/travel/hotels/Red%20Roof%20Inn%205900%20Pfeiffer%20Rd,%20Blue%20Ash,%20O H%2045242%20google/entity/CgsIpv7r-
N3htczhARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4
515404,4597339,4723331,4731329,4757164,4778035,4810792,4810794,4814050,4821091,4861688,4864715,4874
190,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930752,4931360,4936396,
4937897,4938634,4938636,47061553&hl=en-
US&gl=us&ssta=1&q=Red+Roof+Inn+5900+Pfeiffer+Rd,+Blue+Ash,+OH+45242+google&grf=EmQKLAgOEigS
JnIkKiIKBwjnDxACGA4SBwjnDxACGA8gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4N
DA1M2VjNDY2NjhiZWQ6MHhlMTk4ZDcwZGRmMWFmZjI2&rp=EKb-6_jd4bXM4QEQpv7r-
N3htczhATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwiqqPCyxvH8AhUgQzABHT-DCyEQ4gl6BAhrEAU
[88] https://www.expedia.com.tw/en/Cincinnati-Hotels-Red-Roof-Inn-Cincinnati-East-Beechmont.h25044.Hotel-Reviews
[89] https://www.yelp.com/biz/red-roof-inn-cleveland-airport-middleburg-heights-middleburg-heights
[90] https://www.expedia.com/Dayton-Hotels-Red-Roof-Inn-Dayton-North-Airport.h10480.Hotel-Reviews

60. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (J.N.K.) was trafficked at the subject property, the RRI Defendants knew or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at RRI branded properties.

    b. Sex trafficking was a brand-wide problem for RRI originating from management level decisions at their corporate offices in Ohio.

    c. RRI franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel and were facilitating sex trafficking at the branded hotel properties.

    d. RRI's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

    e. RRI and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

61. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, RRI continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject RRI.**

62. Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject RRI and area RRI properties.

63. Internet reviews for the subject RRI and other RRI branded hotels in the surrounding area, which upon information and belief Defendants managed and monitored, show the pervasiveness of sex trafficking before and well after Jane Doe (J.N.K.) was trafficked. For example:

- March 2012 review of the Red Roof Inn located at 31800 Little Mack Ave, Roseville, MI 48066 states, "Old, dirty, hooker-like motel…"[91]

- October 2012 review of the Red Roof Inn located at 2350 Rochester Ct., Troy, MI 48083 states, "If you are looking for a dirt cheap room to kill a hooker in, this is your hotel…the room REEKED of cigarettes and funk…"[92]

- September 2014 review of the Red Roof Inn at 31800 Little Mack Ave., Roseville, MI 48066 states, "…I found a condom wrapper on the floor beside my bed…"[93]

- October 2014 review of the Rochester Ct. RRI states, "…My friend pulled back the covers on their bed, and low and behold a  "USED" condom pops out from near the headboard…"[94]

- May 2015 Expedia review of the RRI at 32511Concord Dr. in Madison Heights, MI states "When I checked into my room, there was a used condom in the toilet. I called down and they moved me into one of their "deluxe" rooms. It smelled a bit like cigarette smoked, but the room was clean otherwise. I stayed for 4 nights and they only cleaned the room once. By the end of my stay, my clean clothes smelled so much like stale cigarette smoke that I coundnt stand how I smelled and had to buy some new clothes for the trip home. I do not smoke. I will never stay there again."[95]

- March 2015 Expedia review of the Concord RRI states "There was a condom behind the bed, hair around one of the pillows, a nonsmoking room that stunk like smoke, it appears that a woman walking with 10 sets of keys with her is suspecios especially when there was woman walking around. Not good, will not visit again, They do not vacuum the carpets."[96]

- June 2016 Tripadvisor review of the Concord RRI states "They say you get what you pay for…I was told by a local whom I was talking to about where I was staying, that there are Hookers who frequent that Inn…"[97]

---

[91] https://www.yelp.com/biz/red-roof-inn-detroit-st-clair-shores-roseville
[92] https://www.yelp.com/biz/red-roof-inn-detroit-troy-troy-2
[93] https://www.expedia.com/Detroit-Hotels-Red-Roof-Inn-Detroit-St-Clair-Shores.h12168.Hotel-Reviews
[94] https://www.tripadvisor.com/Hotel_Review-g42763-d235264-Reviews-Red_Roof_Inn_Detroit_Troy-Troy_Michigan.html
[95] https://www.expedia.com in/Detroit-Hotels-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews
[96] https://www.expedia.com in/Detroit-Hotels-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews
[97] https://www. Tripadvisor.com/Hotel_Review-g42426-d235275-Reviews-Red_Roof_Inn_Detroit_Royal_Oak_Madison_Heights_Madison_Heights_Michigan.html

- April 2016 Tripadvisor review of the Concord RRI states "… What bothered me the most about my stay were the people living in rooms. I questioned if there is prostitution going on in a couple of rooms. Lots of in and out traffic was very distracting."[98]

- October 2017 Expedia review of the Concord RRI states "…Puke in walkways and condom wrappers."[99]

- August 2017 Expedia review of the Concord RRI states "…a place for pimps and hookers to meet up…."[100]

- June 2017 Expedia review of the Concord RRI states "…If you are with family this isn't the place. Looking for cheap hookers then you found it. Area was super sketchy! There was a reason why it was cheap."[101]

- December 2017 Tripadvisor review of the Concords RRI states "…Outside there was a condom on the ground. Not sure if it wasn't more of an hourly rental than an overnight…" [102]

- 2018 Google review of the Concord RRI states "Allot of hookers in and out regularly…"[103]

- 2018 Google review of the Concord RRI states, "Prostitutes."[104]

- May 2018 Goggle review of the Concord RRI states, "If you need Drugs or Prostitutes stay here!!! Where do I start. Stayed here in May 2018. RFoom 126 clearly deals drugs, people in and out all day and all night (5-6/hour) Prostitutes all over this place…"[105]

- 2019 Google review of the Concord RRI states, "Hookers."[106]

---

[98] https://www.tripadvisor.com/Hotel_Review-g42426-d235275 -Reviews-Red_Roof_Inn_Detroit_Royal_Oak_Madison_Heights_Michigan.html
[99] https://www.expedia.co.in/Detroit-Hoetls-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews
[100] https://www.expedia.co.in/Detroit-Hoetls-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews
[101] https://www.expedia.co.in/Detroit-Hoetls-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews
[102] https://www.tripadvisor.com/Hotel_Review-g42426-d235275 -Reviews-Red_Roof_Inn_Detroit_Royal_Oak_Madison_Heights_Michigan.html
[103] https://www.google.com/travel/hotels/Red%20Inn%2032511%20Concord%20Dr.%20Medison%20Heights,%20MI%2948071%20google/entity/Cgo17p33vYbOy
[104] https://www.google.com/travel/hotels/Red%20Inn%2032511%20Concord%20Dr.%20Medison%20Heights,%20MI%2948071%20google/entity/Cgo17p33vYbOy
[105] https:////www.tripadvisor.com/Hotel_Review-g42426-d235275-Reviews-Red_Roof_Inn_Detroit_Royal_Oak_Madison_Heights-Madison_Heights_Michigan.html
[106] https://www.tripadvisor.com/Hotel_Review-g42426-d235275 -Reviews-Red_Roof_Inn_Detrout_Royal_Oak_Madison_Heights_Michigan.html

- January 2019 review of the Concord RRI states, "…My 2 year old found a condom wrapper on the floor next to the bed…"[107]

- October 2021 review of the Concord RRI states, "…While walking to our room, all you could see is all trash and used condoms…"[108]

- September 2021 review of the Concord RRI states, "…opened condom wrappers and trash left all over. STAY AWAY!"[109]

64.     Traffickers, including Jane Doe (J.N.K.)'s traffickers, repeatedly chose to use the subject RRI for their sex trafficking activity. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the subject RRI. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the RRI based on obvious indicators of this activity.

65.     Traffickers, including J.N.K.'s traffickers, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

66.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject RRI prior to Jane Doe (J.N.K.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel

---

[107] https://yelp.com/biz/re-roof-inn-detroit-royal-oak-madison-heights-madison-heights
[108] https://www.expedia.co.in/Detroit-Hoetls-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews
[109] https://www.expedia.co.in/Detroit-Hoetls-Red-Roof-Inn-Detroit-Royal-Oak-Madison-Heights.h5063.Hotel-Reviews

staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

67. All knowledge from the staff at the Concord RRI is imputed to Mahadeva which employed the hotel staff. Thus, Mahadeva knew about the widespread and ongoing trafficking at the Concord RRI, including the trafficking of Jane Doe (J.N.K.), through the direct observations of hotel staff, including management-level staff.

68. All knowledge from the staff at the Concord RRI is imputed to the RRI Defendants, which employed the hotel staff. Thus, the RRI Defendants knew about the widespread and ongoing trafficking at the Concord RRI, including the trafficking of Jane Doe (J.N.K.), through the direct observations of hotel staff, including management-level staff.

69. Upon information and belief, Mahadeva learned or should have learned about the obvious signs of widespread trafficking at the Concord RRI, based on:

    a. surveillance of the property;

    b. internal investigations;

    c. customer complaints;

    d. monitoring of customer feedback;

    e. information received from law enforcement; and

      f.   and other sources of non-public information available to Mahadeva.

70.    Upon information and belief, under the RRI Brand Defendants' protocols, which on their face required hotel staff and franchisees to report suspected criminal activity to the RRI Brand Defendants, hotel staff and Franchisee were required to and did report numerous instances of suspected sex trafficking to the RRI Brand Defendants prior to Jane Doe (J.N.K.)'s trafficking, based on the numerous "red flags" exhibited by the victims who were exploited at the subject RRIs.

71.    Upon information and belief, the RRI Defendants knew or should have known about the widespread trafficking at the subject RRIs based on:

    a.   The RRI Brand Defendants' direct supervision and management of RRI corporate properties, including the Concord RRI.

    b.   The RRI Brand Defendants' collection and review of surveillance footage from RRI branded properties.

    c.   The RRI Brand Defendants' review of security logs that all hotels were required to keep on a form dictated by the RRI Brand Defendants.

    d.   The RRI Brand Defendants' capture, retention, and analysis of extensive data about virtually all aspects of the operation of the RRI branded properties, including extensive guest data and detailed reports about hotel operations through reservation and property management systems.

    e.   The RRI Brand Defendants' capture, review, and analysis of customer feedback from surveys and customer hotlines, which was then circulated and distributed among upper-level management through Negative Review reports.

    f.   The RRI Brand Defendants' protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity the RRI Brand Defendants.

    g.   The RRI Brand Defendants' communication with law enforcement about criminal activity at RRI properties.

    h.   The RRI Brand Defendants' regular inspection of the RRI branded properties.

    i.   Other sources of non-public information available to the RRI Brand Defendants.

72.     Defendants had constructive knowledge of the widespread and ongoing trafficking at the subject RRI because this trafficking resulted from their failure to exercise ordinary care operating the hotels.

73.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at RRI-branded hotels, and at the subject RRI, Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If Defendants had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the subject RRI and that they were financially benefiting from such trafficking.

**c. Defendants knew Jane Doe (J.N.K.) was being trafficked at the subject RRI because of the apparent and obvious "red flags" of sex trafficking.**

74.     During the period that Jane Doe (J.N.K.) was trafficked at the subject RRI, there were obvious signs that her traffickers were engaged in sex trafficking:

   a.  Jane Doe (J.N.K.) would usually book the room herself. The hotel staff observed her and saw that she was emotional, nervous, scared, and often bruised. She was dressed provocatively and had little to no baggage.

   b.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.

   c.  J.N.K. would book two rooms at a time, one for her and one for her trafficker and his enforcers.

   d.  J.N.K. would stay at the RRI for multiple days at a time and had to go to the front desk each day to pay for the rooms again.

   e.  Other girls were being trafficked at the same hotel at the same time as J.N.K. by her trafficker.

   f.  J.N.K. lacked freedom of movement, was constantly monitored and had no control over or possession of money or her identification.

   g.  J.N.K. appeared at the hotel with significantly older men.

h. J.N.K. showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated injuries and/or unusual behavior.

i. J.N.K. and others in her party were not forthcoming about their full names, home addresses or vehicle information when registering.

j. Excessive amounts of alcohol and drugs were in the rooms rented by J.N.K. and others in her party.

k. The "Do Not Disturb" door hanger was used very frequently.

l. Housekeeping staff was usually prevented from entering the room for regular cleaning, towel exchange, and other standard room services.

m. J.N.K. requested extra towels from housekeeping. Hotel staff observed that she was dressed provocatively and was emotional, nervous, scared, and often bruised.

n. Jane Doe (J.N.K.) had multiple johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

o. There was heavy foot traffic in and out of Jane Doe (J.N.K.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

p. After Jane Doe (J.N.K.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant.

q. Depending upon how things were going, Jane Doe (J.N.K.) was trafficked for multiple days at a time at a single location.

r. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

75. Based upon information and belief, multiple employees at the RRI, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

76. As such, Defendants knew or were willfully blind to the fact that Jane Doe (J.N.K.) was being trafficked at the subject RRI property.

77.     Given these obvious signs, RRI Brand Defendants knew or should have known about the trafficking of Jane Doe (J.N.K.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

78.     Defendants also knew or should have known about Jane Doe (J.N.K.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the subject RRI.

79.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at RRI-branded hotels, and at subject RRI, Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (J.N.K.)'s trafficking at the subject RRI and that they were benefiting from such trafficking.

## IV.     Defendants actively facilitated sex trafficking at the subject RRI, including the trafficking of Jane Doe (J.N.K.)

80.     Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (J.N.K.) at the subject RRI because the trafficking was the direct result of Defendants facilitating her trafficking at the subject RRI.

### a.     Franchisee facilitated the trafficking of Jane Doe (J.N.K.) at the Concord RRI.

81.     Franchisee is responsible for the acts, omissions, and knowledge of all employees of the Concord RRI when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of sex trafficking occurring at RRI branded locations including the Concord RRI.

82.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Concord RRI, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Jane Doe (J.N.K.).

83.     Franchisee knew or was willfully blind to the fact that Jane Doe (J.N.K.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (J.N.K.)'s sexual exploitation.

84.     Franchisee also facilitated widespread trafficking at the Concord RRI, including the trafficking of Jane Doe (J.N.K.), in ways including:

    a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    c.  choosing not to report known or suspected criminal activity including sex trafficking to appropriate law enforcement agencies;

    d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b.  The RRI Defendants facilitated the trafficking of Jane Doe (J.N.K.) at the corporate-operated Concord RRI.**

85.     The RRI Defendants are responsible for the acts, omissions, and knowledge of all employees of the Concord RRI when operating the hotel because these acts and omissions were committed in the scope and course of employment, because the RRI Defendants ratified these acts and omissions, and because the RRI Defendants failed to exercise reasonable care with regard to

the hiring, training, and supervision of these employees given the specific risks, known to the RRI Defendants, of sex trafficking occurring at RRI branded locations including the Concord RRI.

86. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Concord RRI, the RRI Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Jane Doe (J.N.K.).

87. The RRI Defendants knew or were willfully blind to the fact that Jane Doe (J.N.K.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (J.N.K.)'s sexual exploitation.

88. The RRI Defendants also facilitated widespread trafficking at the Concord RRI, including the trafficking of Jane Doe (J.N.K.), in ways including:

   a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   c. choosing not to report known or suspected criminal activity including sex trafficking to appropriate law enforcement agencies;

   d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

   **c. RRI Brand Defendants facilitated the trafficking of Jane Doe (J.N.K.) at the subject RRI.**

89. Upon information and belief, RRI Brand Defendants participated directly in aspects of the operation of the subject RRIs that influenced whether and to what extent trafficking occurred at the hotel, including the trafficking of Jane Doe (J.N.K.), as follows:

36

a. They retained control over and responsibility for training related to detecting and responding to human trafficking.

b. They retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking.

c. Dictating policies for monitoring and surveillance of RRI hotels.

d. They were responsible for maintaining, monitoring, and analyzing patterns of criminal activity in RRI hotels.

e. Dictating when and how hotel staff and Franchisee should interact with law enforcement.

f. They assumed responsibility for distributing safety-related information, including information related to trafficking, to Franchisee and hotel staff.

g. They assumed responsibility for monitoring circumstances and events associated with a high risk of trafficking and notifying Franchisee and hotel staff of the same;

h. They retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the hotel, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

i. They retained control to assess or audit hotel properties, specifically, for the purpose of evaluating whether safety and security measures, including those related to trafficking, are in place.

j. They retained control to develop property-specific protocols for hotels that were experiencing a particular type of criminal activity.

90. RRI Brand Defendants directly participated in and retained day-to-day control over renting rooms at the subject RRI by, among other things:

a. They controlled all details of the guest reservation, check-in, and payment processes through management of and control over all systems used for those processes and through adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

b. They directly took reservations for rooms at the Subject RRI and accepted payment for those rooms through a central reservation system that they controlled and operated.

c. They could make reservations and take payment for rooms without any involvement or approval by the Franchisee.

d. When a guest did not make a reservation in advance through the central reservation system, they still controlled the specific process used to register a walk-in guest and generate a reservation for that guest by requiring its Franchisee to use a RRI system to process the room rental and payment.

e. They set or otherwise controlled room prices, required discounts, and reward programs.

f. They controlled all guest data related to room rentals.

g. They set policies on refusing service.

h. They controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

i. They required hotel staff and management to notify them when evicting a guest from a room.

j. They established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the hotel until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

k. They required Franchisee to use a property management system, which was owned, maintained, and controlled by RRI Brand Defendants, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, they had direct involvement in room rentals.

l. They oversaw do not rent (DNR) lists for their branded properties.

m. They collected, tracked, and reported comprehensive information about each guest.

91. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject RRI, RRI Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (J.N.K.).

92.     RRI Brand Defendants knew or should have known that Jane Doe (J.N.K.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (J.N.K.)'s sexual exploitation.

93.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject RRI, the RRI Brand Defendants continued participating in a venture at that hotel, with its Franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including the following:

    a.  They adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining Franchisee and front-line hotel staff regarding issues related to human trafficking.

    b.  They implicitly condoned and endorsed repeated decisions by Franchisee and hotel staff not to report to law enforcement or respond to trafficking appropriately.

    c.  They encouraged hotel staff and Franchisee to focus on revenue rather than preventing use of rooms for criminal activity, including trafficking.

    d.  They continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking.

    e.  They adopted policies and practices that allowed traffickers to reserve rooms using fake names and without providing valid identification matching the name on the room reservation.

    f.  They adopted policies and practices allowed traffickers to reserve rooms using prepaid cards and cash, which provided relative anonymity and non-traceability.

    g.  They adopted policies and practices that allowed access to high volumes of unregistered guests all going into the same room without logging these guests or requiring identification.

    h.  They attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

    i.  They reduced security costs by foregoing proper security measures.

      j.   They continued to allow the Subject RRI to use RRI trademarks despite actual or constructive knowledge of widespread and ongoing sex trafficking.

94.    If RRI Brand Defendants had exercised reasonable diligence when operating the RRIs and in the areas where it retained control, RRI Brand Defendants would have prevented the RRIs from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.N.K.). Instead, RRI Brand Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.N.K.).

## V.   Defendants' ventures at the Subject RRI.

95.    Through the actions described above, each Defendant participated in a venture that the Defendant knew or should have known had engaged in violations of the TVPRA.

96.    Each Defendant directly benefited from facilitating trafficking at the Subject RRI, including in the following ways:

      a.   Mahadeva directly benefited from increased revenue each time a room was rented at the Concord RRI, including each room rented to a trafficker.

      b.   Each of the RRI Brand Defendants received increased revenue each time a room was rented at the Concord RRI, including each room rented to a trafficker, because the payments these defendants received pursuant to their agreement with Mahadeva were primarily determined by gross room revenue. Upon information and belief, the revenue derived from this agreement with Mahadeva was shared among the RRI Brand Defendants.

      c.   Each of the RRI Defendants received increase revenue each time a room was rented at the Concord RRI, including each room rented to a trafficker. Upon information and belief, the revenue derived from operation of the Concord RRI was distributed among RRI Defendants pursuant to written agreements and established practices.

97.    By participating in a venture that facilitated sex trafficking, each Defendant also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer

base seeking to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Subject RRI specifically.

98.    Through the conduct described above, Defendants knowingly benefited from engaging in a venture, in the form of an ongoing business relationship, with sex traffickers at the RRI, including Jane Doe (J.N.K.)'s traffickers, as follows:

a.  As detailed above, each Defendant received benefits, including increased revenue, every time a room was rented at the subject RRI.

b.  This venture violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the Subject RRI, which each Defendant knew or should have known about.

c.  Defendants associated with traffickers, including Jane Doe (J.N.K.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d.  Defendants had a mutually beneficial relationship with the traffickers at the subject RRI, fueled by sexual exploitation of victims.

e.  Sex traffickers, including Jane Doe (J.N.K.)'s traffickers, frequently used the subject RRI for their trafficking because of an implicit understanding that these hotels provided a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Defendants.

f.  Each of the Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  Jane Doe (J.N.K.)'s trafficking at the subject RRI resulted from Defendants' participation in a venture with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (J.N.K.)'s trafficking at the Subject RRI.

99. Through the conduct described above, each of the Defendants also knowingly benefited from engaging in a commercial venture with other Defendants and with hotel staff as follows:

   a. Defendants associated with one another and with the hotel staff to operate the Subject RRI.

   b. As detailed above, each Defendant received financial benefits from operating the Subject RRI, including revenue generated specifically by renting rooms to traffickers. Defendants engaged in revenue sharing and had a common incentive to maximize revenue.

   c. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the Defendants' facilitation of widespread sex trafficking at the Subject RRI.

   d. Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Each Defendant participated in the venture by continuing to associate with the hotel staff and with other Defendants to operate the Subject RRI in a way that the Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (J.N.K.).

   e. Jane Doe (J.N.K.)'s trafficking at the Subject RRI resulted from the hotel staff and Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Subject RRI. Had Defendants not continued participating in a venture that they knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from Jane Doe (J.N.K.)'s trafficking at the Subject RRI.

## VI. Franchisee and the Staff at the RRI Acted as Actual Agents of RRI Brand Defendants.

100. RRI Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee and the staff at the subject RRI, which are RRI Brand Defendants' actual agents or subagents.

101. The RRI Brand Defendants subjected Franchisee to detailed standards and requirements regarding the operation of the subject RRI through the franchising agreement,

through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the RRI Brand Defendants.

102.    The RRI Brand Defendants obscure the full extent of control they exercise over the Franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the RRI Brand Defendants imposed on the Franchisee:

    a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee used at the subject RRI;

    b.  covered virtually all aspects of hotel operations, including internal operating functions;

    c.  dictated the specific manner in which Franchisee and hotel staff must carry out most day-to-day functions at the subject RRI; and

    d.  significantly exceeded what was necessary for RRI Brand Defendants to protect its registered trademarks.

103.    In addition to the ways described above, upon information and belief, RRI Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the subject RRI, including the following ways:

    a.  imposing robust reporting and recordkeeping requirements on all hotels, including franchised hotels;

    b.  requiring all hotels, including franchised hotels, to use a consolidated IT system and database for property management as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated;

    c.  requiring Franchisee to allow RRI Brand Defendants to install antivirus and web filtering software and to monitor and maintain computers at the front desk and in the back office;

    d.  controlling "a fully integrated database" which all hotels, including franchised hotels, must use to access customer data, reservations, and other information that is shared system-wide between the RRI Brand Defendants and their system hotels;

    e.  fixing prices for all hotels, including franchised hotels;

f.   mandating specific training for Franchisee and hotel management at franchised hotels;

g.   mandating on-site training for hotel staff at franchised hotels;

h.   requiring online training for Franchisee and staff of franchised hotels through the Red Roof Learning Management System;

i.   requiring use of standardized training methods for employees of franchised hotels;

j.   retaining sole discretion to determine whether training has been completed in a satisfactory manner;

k.   requiring hotel management at franchised hotels to attend conferences and meetings;

l.   adopting detailed job descriptions for employees to staff all hotels, including franchised hotels, and drafting policies and requirements that specifically dictate which staff members must perform day-to-day functions and how they must perform those functions;

m.   controlling channels for guests to report complaints or provide feedback regarding franchised hotels and supervising and/or dictating the response to those complaints;

n.   retaining the right to intervene directly to resolve a guest complaint about a franchised hotel and requiring the Franchisee to reimburse the RRI Brand Defendants for any payment or other consideration paid to a complaining guest;

o.   retaining the ability to require all franchised hotels to participate in centralized operational services;

p.   controlling all aspects of facility and building design and maintenance at franchised hotels;

q.   collecting, monitoring, and analyzing dozens of reports regarding franchised hotels through the backend of the property management system and using these reports to supervise and control the day-to-day operations;

r.   exercising significant control over Franchisee's procurement by designating what specific equipment and supplies franchisees must buy and designating approved vendors from which purchases can be made;

s.   requiring franchised hotels to use approved vendors for internet services;

t.   imposing other requirements for Wi-Fi access and filtering at franchised hotels;

u.   imposing detailed insurance requirements for Franchisee;

v.   posting jobs for both corporate and franchised properties;

w.  dictating interview techniques and questions for specific positions

x.   providing benefits to employees of franchised properties;

y.   controlling all marketing for franchised properties;

z.   assuming control of media for all properties;

aa.  retaining nearly unlimited right to revise policies or adopt new requirements for day-to-day operations of franchised properties;

bb.  other actions that deprived Franchisee of independent in the business operations in operating RRI hotels; and

cc.  regularly inspected each of the subject RRIs, including the franchised hotels.

104.    The RRI Brand Defendants specifically retained control of the day-to-day operation of Franchisee with regards to aspects of operation of the subject RRI that caused Jane Doe (J.N.K.)'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

105.    Upon information and belief, each of the RRI Brand Defendants acted, individually and collectively with the other RRI Brand Defendants, to implement these mechanisms of control over RRI branded properties and RRI franchisees.

106.    At all relevant times, Franchisee acted as agents of the RRI Brand Defendants when operating the Subject RRI.

**VII. RRI Brand Defendants are Jointly Responsible for the Trafficking of Jane Doe (J.N.K.)**

107. Upon information and belief, at all relevant times, the RRI Brand Defendants shared a headquarters, corporate officers, employees, and other resources related to franchising, operation, and control of the subject RRI.

108. Upon information and belief, at all relevant times, the RRI Brand Defendants acted jointly to adopt and enforce policies, procedures, and standards for subject RRI; to participate in and supervise day-to-day operations at those hotels; and to rent rooms at those properties.

109. Upon information and belief, each of the RRI Defendants shared in and benefited from revenue generated from franchising, operation, and control of the subject RRI and each of the RRI Defendants received a direct benefit when a room was rented to a trafficker at these hotels.

110. Upon information and belief, each of the RRI Defendants—through its individual acts and omissions and through its joint acts and omissions with other RRI Defendants— knowingly benefited from participating a venture that it knew or should have known was engaged in a violation of the TVPRA.

111. Moreover, the RRI Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

112. Upon information and belief, operation of the subject RRI was part of a single unified operation by RRI Defendants. Upon information and belief, all RRI Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, RRI Brand Defendants acted jointly to own, operate, control, manage, and supervise the subject RRI. As an integrated enterprise and/or joint

venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

## VIII.   Defendants are Jointly and Severally Liable for Jane Doe (J.N.K.)'s Damages.

113.   The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (J.N.K.).

114.   Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (J.N.K.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

### CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

115.   Jane Doe (J.N.K.) incorporates all other allegations.

## I.   Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (all Defendants)

116.    Jane Doe (J.N.K.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

117.   Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (J.N.K.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at their respective hotel properties.

118.   Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane

Doe (J.N.K.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

## II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

119.    Jane Doe (J.N.K.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

120.    Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (J.N.K.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (J.N.K.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

121.    Through the acts and omissions described throughout this Complaint, RRI Defendants received a financial benefit from participating in a venture with its respective franchisee regarding the operation of its respective hotel property despite the fact that RRI Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

122.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (J.N.K.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

### III.     Cause of Action: Vicarious Liability for TVPRA Violations (RRI Defendants).

123.     Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

124.     Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

125.     Franchisee and its staff acted as the actual agents of RRI Brand Defendants when operating their respective hotel property.

126.     Through the acts and omissions described throughout this Complaint, RRI Brand Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its Franchisee to operate its respective hotel property.

127.     RRI Brand Defendants are vicariously liable for the TVPRA violations of Franchisee, and the subagents of that Franchisee.

128.     Additionally, on information and belief, each of the RRI Defendants participated in a joint venture. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another.

### DISCOVERY RULE

129.     To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.N.K.) invokes the discovery rule. At the time she was harmed and through at least 2016, Jane Doe (J.N.K.) was under coercion and control of traffickers who abused and manipulated her. Thus, Jane Doe (J.N.K.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Jane Doe (J.N.K.)—through no fault of her own—lacked the information to bring a

claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of J.N.K. being kept under the control of her traffickers, which Defendants facilitated.

130.    At the time Jane Doe (J.N.K.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

131.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.N.K.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (J.N.K.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (J.N.K.) filed this lawsuit.

132.    As a result of her continuous trafficking at the subject RRI through at least 2016, Jane Doe (J.N.K.) was beaten, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

133.    Jane Doe (J.N.K.) was under the continuous control of her traffickers through at least 2016. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

134.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.N.K.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of

continuous and ongoing tortious conduct by Defendants, individually and in concert, across the Red Roof Inn subject location.

135.    Jane Doe (J.N.K.) was subject to continuous trafficking at the subject RRI through at least January 31, 2014, which is not more than 10 years before Jane Doe (J.N.K.) filed this lawsuit.

136.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject RRI and Defendants' ongoing venture with one another and with criminal traffickers.

## **DAMAGES**

137.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (J.N.K.) to sustain legal damages.

138.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (J.N.K.).

139.    Jane Doe (J.N.K.) is entitled to be compensated for personal injuries and economic damages, including:

    a.   Actual damages (until trial and in the future)

    b.   Incidental and consequential damages (until trial and in the future);

    c.   Mental anguish and emotional distress damages (until trial and in the future);

    d.   Lost earnings and lost earning capacity (until trial and in the future);

    e.   Necessary medical expenses (until trial and in the future);

    f.   Life care expenses (until trial and in the future);

    g.   Physical pain and suffering (until trial and in the future);

    h.   Physical impairment (until trial and in the future);

i.   Exemplary/Punitive damages;

j.   Attorneys' fees;

k.   Costs of this action; and

l.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

140.   Jane Doe (J.N.K.) demands a jury trial on all issues.

## RELIEF SOUGHT

141.   WHEREFORE, Jane Doe (J.N.K.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (J.N.K.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (J.N.K.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**MONTGOMERY JONSON LLP**

*/s/ George D. Jonson*
GEORGE D. JONSON (0027124)
LISA M. ZARING (0080659)
MONTGOMERY JONSON LLP
600 Vine Street, Suite 2650
Cincinnati, Ohio 45202
gjonson@mojolaw.com / 513.768.5220
lzaring@mojolaw.com / 513.768.5207

and

**PROVOST ☆ UMPHREY LAW FIRM, L.L.P.**

BRYAN O. BLEVINS JR.
Texas Bar No. 02487300 *(pro hac motion to follow)*
MATTHEW MATHENY

Texas Bar No. 24039040 *(pro hac motion to follow)*
GUY G. FISHER
Texas Bar No. 07051010 *(pro hac motion to follow)*
COLIN MOORE
Texas Bar No. 24041513 *(pro hac motion to follow)*
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
bblevins@pulf.com
mmatheny@pulf.com
cmoore@pulf.com
cbrown@pulf.com

and

**FIBICH, LEEBRON, COPELAND & BRIGGS**

KENNETH T. FIBICH
Texas Bar No. 06952600 *(pro hac motion to follow)*
SARA J. FENDIA
Texas Bar No. 06898800 *(pro hac motion to follow)*
KELLEY BOGUSEVIC
Texas Bar No. 24063159 *(pro hac motion to follow)*
1150 Bissonnet Street
Houston, Texas 77005
713-751-0025 (Telephone)
713-751-0030 (Facsimile)
tfibich@fibichlaw.com
sfendia@fibichlaw.com
kbogusevic@fibichlaw.com

**ATTORNEYS FOR PLAINTIFF**

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jane Doe (J.N.K.)

## DEFENDANTS

Red Roof Inns, Inc. et al.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Franklin
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

George D. Jonson, Montgomery Jonson LLP, 600 Vine Street, Suite 2650, Cincinnati, OH 45202, (513) 768-5220

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION** | | |
| | | | ☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 2,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Algenon Marbley

DOCKET NUMBER   see attached list

DATE
January 31, 2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ George D. Jonson

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**<u>RELATED CASES</u>**

**ALL WITH JUDGE ALGENON L. MARBLEY:**

| | Case Number | Case Caption | Date Filed |
|---|---|---|---|
| 1 | **2:19-cv-755** | ***H.H. v. G6 Hospitality LLC et al*** | **March 3, 2019** |
| 2 | 2:19-cv-849 | *M.A. v. Wyndham Hotels & Resorts, Inc., et al.* | March 8, 2019 |
| 3 | **2:19-cv-1194** | ***Doe S. W. v. Lorain-Elyria Motel, Inc., et al.*** | **March 29, 2019** |
| 4 | **2:19-cv-4965** | ***A.C. v. Red Roof Inns, Inc., et al.*** | **November 8, 2019** |
| 5 | 2:21-cv-4933 | *T.P. v. Wyndham Hotels & Resorts, Inc., et al.* | October 2, 2021 |
| 6 | 2:21-cv-4934 | *A.W. v. Red Roof Inns, Inc., et al.* | October 2, 2021 |
| 7 | 2:21-cv-4935 | *A.R. v. Wyndham Hotels & Resorts, Inc., et al.* | October 2, 2021 |
| 8 | 2:21-cv-5022 | *C.T. v. Red Roof Inns, Inc., et al.* | October 12, 2021 |
| 9 | 2:22-cv-1924 | *L.G. v. Red Roof Inns, Inc., et al.* | April 9, 2022 |
| 10 | 2:22-cv-2682 | *G.P. v. Wyndham Hotels & Resorts, Inc., et al.* | July 2, 2022 |
| 11 | 2:22-cv-2683 | *K.C. v. Choice Hotels International, Inc., et al.* | July 2, 2022 |
| 12 | 2:22-cv-2690 | *R.C. v. Choice Hotels International, Inc., et al.* | July 5, 2022 |
| 13 | 2:22-cv-2734 | *S.C. v. Wyndham Hotels & Resorts, Inc., et al.* | July 8, 2022 |
| 14 | 2:22-cv-2861 | *S.R. v. Wyndham Hotels & Resorts, Inc., et al.* | July 19, 2022 |
| 15 | 2:22-cv-3080 | *J.S. v. Choice Hotels International, Inc.* | August 9, 2022 |
| 16 | 2:22-cv-3185 | *T.E. v. Wyndham Hotels & Resorts, Inc., et al.* | August 19, 2022 |
| 17 | 2:22-cv-3202 | *B.D.G. v. Choice Hotels International, Inc.* | August 21, 2022 |
| 18 | 2:22-cv-3203 | *P.S. v. Six Continents Hotels, Inc., et al.* | August 21, 2022 |
| 19 | 2:22-cv-3256 | *A.K. W v. Red Roof Inns, Inc., et al.* | August 26, 2022 |
| 20 | 2:22-cv-3258 | *M.H. v. Red Roof Inns, Inc., et al.* | August 26, 2022 |
| 21 | 2:22-cv-3340 | *J.C. v. G6 Hospitality, LLC* | September 2, 2022 |
| 22 | 2:22-cv-3416 | *H.C. v. Red Roof Inns, Inc., et al.* | September 13, 2022 |
| 23 | 2:22-cv-3766 | *G.G. v. Red Roof Inns, Inc., et al.* | October 22, 2022 |
| 24 | 2:22-cv-3767 | *Y.S. v. Red Roof Inns, Inc., et al.* | October 22, 2022 |
| 25 | 2:22-cv-3768 | *A.Y. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 26 | 2:22-cv-3769 | *K.L. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 27 | 2:22-cv-3770 | *R.C.C. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 28 | 2:22-cv-3771 | *N.B. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 29 | 2:22-cv-3772 | *C.B. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 30 | 2:22-cv-3773 | *K.R.L. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 31 | 2:22-cv-3774 | *R.H. v. Red Roof Inns, Inc., et al.* | October 23, 2022 |
| 32 | 2:22-cv-3776 | *J.B. v. Red Roof Inns, Inc., et al.* | October 24, 2022 |
| 33 | 2:22-cv-3778 | *H.S. v. Red Roof Inns, Inc., et al.* | October 24, 2022 |
| 34 | 2:22-cv-3782 | *R.K. v. Red Roof Inns, Inc., et al.* | October 24, 2022 |
| 35 | 2:22-cv-3784 | *R.Z. v. Red Roof Inns, Inc., et al.* | October 24, 2022 |
| 36 | 2:22-cv-3786 | *D.K. v. Red Roof Inns, Inc., et al.* | October 24, 2022 |
| 37 | 2:22-cv-3787 | *K.D. v. Red Roof Inns, Inc., et al.* | October 24, 2022 |

| 38 | 2:22-cv-3788 | *G.M. v. Choice Hotels International, Inc., et al.* | October 24, 2022 |
|---|---|---|---|
| 39 | 2:22-cv-3797 | *A.M. v. Wyndham Hotels and Resorts, Inc., et al.* | October 25, 2022 |
| 40 | 2:22-cv-3978 | *C.M. v. Choice Hotels International, Inc., et al.* | October 25, 2022 |
| 41 | 2:23-cv-3459 | *R.A. v. Best Western International, Inc., et al.* | October 10, 2023 |
| 42 | 2:23-cv-4195 | *A.M.G. v. Red Roof Inns, Inc., et al.* | December 20, 2023 |
| 43 | 2:23-cv-4258 | *C.M.G. v. Red Roof Inns, Inc., et al.* | December 28, 2023 |
| 44 | 2:23-cv-4256 | *D.E.G. v. Red Roof Inns, Inc., et al.* | December 28, 2023 |