# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **J.N.K.,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:24-cv-00389** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **RED ROOF INNS,** *et al.*, | : | **Magistrate Judge Elizabeth P. Deavers** |
| | : | |
| **Defendants.** | : | |
| | : | |

## OPINION & ORDER

This matter comes before this Court on: (1) Defendants Red Roof Inns, Inc., RRF Holding Company LLC, Red Roof Franchising, LLC, and RRI West Management, LLC's ("RRI Defendants") motion to transfer venue or, in the alternative, to dismiss for failure to state a claim (ECF No. 20); (2) RRI Defendants' motion for leave to respond to Plaintiff J.N.K.'s notice of supplemental authority (ECF No. 33); and (3) Defendant Mahadeva Madison Heights Holdings, LLC's ("Mahadeva" or "Franchisee") motion to transfer venue (ECF No. 37). For the reasons that follow, this Court **GRANTS IN PART** and **DENIES IN PART** RRI Defendants' motion to transfer venue or, in the alternative, to dismiss. (ECF No. 20). Specifically, RRI Defendants' request to transfer the case to the Eastern District of Michigan is **DENIED**; and their motion to dismiss is **GRANTED** with respect to Plaintiff's perpetrator liability claim and **DENIED** as to all other claims. Additionally, because this Court does not rely on any authority contained in Plaintiff's notice of supplemental authority, RRI Defendants' motion for leave (ECF No. 33) is **DENIED AS MOOT**. Finally, this Court **DENIES** Defendant Mahadeva's motion to transfer venue. (ECF No. 37).

# I.  BACKGROUND

This case arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a). Plaintiff J.N.K., a Michigan resident, alleges that, from 2013 to January 31, 2014, she was repeatedly sex trafficked at 32511 Concord Dr., Madison Heights, Michigan 48071 ("Madison RRI"). (ECF No. 1 ¶ 8, 27–28). During this time, Plaintiff alleges that her traffickers "controlled her through physical violence and force," "made her engage in commercial sex acts for their financial benefit," "posted ads of her online without her consent," beat her when she tried to leave, and kept her "under constant surveillance." (*Id.* ¶ 24). She states that she was never allowed to keep any of the money she made, and one trafficker forced her "to get a large tattoo of his name on her back." (*Id.*).

In January 2024, Plaintiff sued the franchisors, managers, and operators of the Madison RRI ("**RRI Defendants**");[1] and its owner and operator, Mahadeva Madison Heights Holdings, LLC ("**Franchisee**"), seeking damages under the TVPRA's civil liability provision. 18 U.S.C. 1595(a). She explains that RRI Defendants' control and supervision over the Madison RRI included "collection and review of surveillance footage," "capture, retention, and analysis of . . . extensive guest data and detailed reports about hotel operations through reservation and property management systems," (ECF No. 1 ¶ 71, 78), "monitor[ing] news stories and law-enforcement reports regarding criminal activity," and "carefully monitoring online reviews and other customer feedback." (*Id.* ¶¶ 56–57). Plaintiff's reason for initiating this action in this district, as alleged in

---

[1] "**RRI Defendants**" include Red Roof Inns, Inc.; RRF Holding Company, LLC; Red Roof Franchising, LLC; and RRI West Management which, according to Plaintiff, "operated, controlled, and/or managed" the Madison RRI. (ECF No. 1 ¶ 14). Describing the relationship between these entities, Plaintiff alleges that Red Roof Inns, Inc. and RRI West Management share a common parent company (*id.* ¶ 15); RRF Holding Company, LLC is the direct subsidiary of Red Roof Inns, Inc. (*id.* ¶ 13); and RRI West Management; Red Roof Inns, Inc.; and Red Roof Franchising, LLC are corporate affiliates. (*Id.* ¶ 15).

the Complaint, is that RRI Defendants operated the Madison RRI "from a central location at the RRI corporate offices in New Albany, Ohio." (*Id.* ¶ 22). Plaintiff contends that her claims against Franchisee likewise arose out of the "Franchisee's contacts with Ohio through Franchisee's relationship with the RRI [] Defendants." (*Id.* ¶ 23).

Given the degree of control and supervision that RRI Defendants maintained over the Madison RRI, Plaintiff asserts that RRI Defendants "knew or should have known" about her sex trafficking based on "obvious indicators" and "well-known 'red flags' for sex trafficking in the hospitality industry." (*Id.* ¶ 64). These signs include "paying with cash or prepaid cards, having high volumes of men who [are] not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs . . . ." (*Id.* ¶ 66). Aside from the trafficking she herself endured, Plaintiff alleges that "multiple trafficking victims [were] exploited at the subject RRIs prior to [J.N.K.'s] trafficking" who exhibited these "red flags" that were "observed by hotel staff and management." (*Id.*).

As for her own trafficking, Plaintiff alleges that employees at the Madison RRI "observed or were made aware of" these "obvious signs of trafficking," as well as other indicators. (*Id.* ¶ 75). For example, Plaintiff alleges she would stay at the RRI "for multiple days at a time" and "had to go to the front desk each day to pay for the rooms again." (*Id.* ¶ 74). These rooms were "frequently paid for with cash or prepaid cards," and J.N.K. "would book two rooms at a time, one for her and one for her trafficker and his enforcers." (*Id.*). When booking the rooms, Plaintiff notes that "hotel staff observed her and saw that she was emotional, nervous, scared, and often bruised"; that she was "dressed provocatively"; and that she "had little to no baggage." (*Id.*). Plaintiff also asserts that she "showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated

injuries and/or unusual behavior." (*Id.*). Other indicators "consistent with the modus operandi of her trafficker," according to Plaintiff, included:

- Other girls were being trafficked at the same hotel at the same time as J.N.K. by her trafficker.

- J.N.K. lacked freedom of movement, was constantly monitored and had no control over or possession of money or her identification.

- J.N.K. appeared at the hotel with significantly older men.

- J.N.K. and others in her party were not forthcoming about their full names, home addresses or vehicle information when registering.

- Excessive amounts of alcohol and drugs were in the rooms rented by J.N.K. and others in her party.

- The "Do Not Disturb" door hanger was used very frequently.

- Housekeeping staff was usually prevented from entering the room for regular cleaning, towel exchange, and other standard room services.

- J.N.K. requested extra towels from housekeeping. Hotel staff observed that she was dressed provocatively and was emotional, nervous, scared, and often bruised.

- Jane Doe (J.N.K.) had multiple johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

- There was heavy foot traffic in and out of Jane Doe (J.N.K.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

- After Jane Doe (J.N.K.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant.

(*Id.*). Plaintiff further contends that Defendants and her traffickers had "an implicit understanding" that allowed her traffickers to operate openly and "with little regard for concealment." (*Id.* ¶ 65).

Plaintiff's complaint, filed on January 31, 2024, asserts three "causes of action" under the TVPRA against RRI Defendants: (1) a claim for perpetrator liability; (2) a claim for beneficiary

liability; and (3) a claim for vicarious liability. (ECF No. 1 ¶¶ 115–128). On April 1, 2024, RRI Defendants moved to transfer this case to the Eastern District of Michigan under 28 U.S.C. 1404(a) or, in the alternative, to dismiss the complaint for failure to state a TVPRA claim. (ECF No. 20). Plaintiff opposed (ECF No. 24), and RRI Defendants replied. (ECF No. 30). Franchisee also moved to transfer this case to the Eastern District of Michigan (ECF No. 37), which Plaintiff opposed (ECF No. 38), and Franchisee replied (ECF No. 39). On August 19, 2024, Plaintiff filed a notice of supplemental authority (ECF No. 32) informing this Court of an out-of-circuit decision denying a hotel franchisor's motion to transfer venue, *see Jane Doe (T.D.B.) v. G6 Hosp., LLC*, No. 9:23cv174, ECF. No. 50 (E.D. Tex. Aug. 9, 2024). RRI Defendants moved for leave to oppose Plaintiff's notice (ECF No. 33), and Plaintiff replied (ECF No. 34). These matters are now ripe for resolution.

## II.     STANDARD OF REVIEW

### A.  Motion to Transfer under 28 U.S.C. § 1404(a)

Section 1404(a) governs the transfer of a civil action from one federal district to another. It provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). Courts considering transfer under § 1404(a) must first determine whether the requested transferee forum provides a proper venue for the action. *See e.g.*, *Dayton Superior Corp. v. Yan*, 288 F.R.D. 151, 169 (S.D. Ohio 2012). As the Supreme Court explained, the statute "does not condition transfer on the initial forum's being 'wrong'." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). Instead, it "permits transfer to any district where venue is also proper"—that is, "where the case might have been brought." *Id.* Once the court determines that the action could have been brought in the alternative venue, it proceeds to consider

5

whether transferring the case would serve the convenience of parties and witnesses and otherwise promote the interest of justice. *See Tanyike v. United States*, 603 F. Supp. 3d 572, 580 (S.D. Ohio 2022). A court, guided by a number of private and public interest factors, enjoys "broad discretion" when making this determination. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Those factors include:

> (1) convenience of the witnesses; (2) availability of judicial process to compel the attendance of unwilling or uncooperative witnesses; (3) location of the relevant documents or records, and the relative ease of access to sources of proof; (4) residence and convenience of the parties; (5) relative financial means and resources of the parties; (6) locus of the operative facts and events that gave rise to the dispute or lawsuit; (7) each judicial forum's familiarity with the governing law; (8) the deference and weight accorded to the plaintiff's choice of forum; and (9) trial efficiency, fairness, and the interests of justice based on the totality of the circumstances.

*See Tanyike*, 603 F. Supp. 3d at 580 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)).

Transfer is inappropriate, however, when it merely shifts the burden of inconvenience. *See Van Dusen v. Barrack*, 376 U.S. 612, 645–46 (1964).  A plaintiff's choice of forum is therefore entitled to "great deference" and "should only be rejected if the above factors weigh heavily in favor of the defendant."  *In re Richardson-Merrell, Inc.*, 545 F. Supp. 1130, 1132-33 (S.D. Ohio 1982); *see also Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 672–73 (S.D. Ohio 2011) (noting that there is "a strong presumption in favor of a plaintiff's choice of forum," which may be overcome "'only when the private and public interest factors clearly point towards trial in the alternative forum.'" (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)). By contrast, a plaintiff's choice of forum is "given little weight" if "none of the conduct complained of occurred in the forum selected by the plaintiff." *Capitol*, 801 F. Supp. 2d at 672–73 (internal quotation marks and citations omitted).

The moving party bears the burden of establishing that transfer is warranted to allow for the litigation to proceed in a more convenient forum, not merely "a forum likely to prove equally convenient or inconvenient." *Van Dusen*, 376 U.S. at 645–46; *Centerville ALF, Inc. v. Balanced Care Corp.*, 197 F. Supp. 2d 1039, 1049 (S.D. Ohio 2002).

### B.  Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

A district court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). In ruling on a 12(b)(6) motion, a court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). If more than one inference may be drawn from an allegation, the court must resolve the conflict for the plaintiff. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

The court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although liberal, Rule 12(b)(6) requires more than bare assertions of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). To survive dismissal, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A claim is plausible when it contains

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### III.  LAW & ANALYSIS

#### A.  Motion to Transfer to the Eastern District of Michigan

RRI Defendants argue that transfer to the Eastern District of Michigan is appropriate because Plaintiff is a Michigan resident whose allegations arise from events in Michigan. (*See generally,* ECF No. 20 at 11–17).[2]  Franchisee, a Michigan-based entity, urges transfer for similar reasons. (*See* ECF No. 37 at 4 ("Plaintiff resides in Michigan, the property is in Michigan, and the registered agent for the former owner, [Franchisee], is in Michigan."). Opposing both motions, Plaintiff disputes that the location of relevant events is Michigan because "a significant portion of her claims center on RRI Defendants' corporate wrongdoing originating from their Ohio headquarters." (ECF No. 24 at 29 (citing ECF No. 1 ¶¶ 26-28); ECF No. 38 at 7).

In determining whether transfer is appropriate, this Court balances the private and public interest factors at stake. Because Defendants' motions raise substantially similar arguments and seek the same relief, this Court addresses them together.

##### 1.  Private Interest Factors

Private interest factors include convenience of witnesses, where the operative facts occurred, the location of the documentary evidence, and possibility of prejudice in either the forum or the transfer states. *W. Am. Ins. Co. v. Potts*, 908 F.2d 974 (6th Cir. 1990). While the plaintiff's choice of venue should typically be given considerable weight, such choice is given less weight

---

[2] Defendants do not argue that venue in the Southern District of Ohio is improper. Nor do the parties argue that the Eastern District of Michigan is an improper venue.

when the cause of action "has little connection with the chosen forum." *DRFP, LLC v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890, 902-03 (S.D. Ohio 2013).

*a. Convenience of the Witnesses*

Because Plaintiff alleges that she was trafficked at a Red Roof branded property in Michigan, Defendants contend that "nearly every witness" likely to be called in this lawsuit is located in Michigan. These include: (1) Plaintiff's traffickers; (2) Madison RRI staff; (3) local law enforcement; (4) Plaintiff's family members; and (5) "johns" and others that Plaintiff might have encountered. RRI Defendants also contend that these Michigan-based witnesses will be beyond the subpoena power of this Court at the time of trial.

Plaintiff discounts Defendants' argument as speculative and conclusory. Given the time that has passed since J.N.K.'s trafficking, she argues that "it is possible and even likely that many of the witnesses who were present in Michigan at the time of J.N.K.'s trafficking do not currently live there." (ECF No. 24 at 32). Even if some witnesses currently live in Michigan, Plaintiff maintains that the "witnesses who can testify about RRI corporate matters are located at the headquarters in New Albany, Ohio." (*Id.* at 31–33). Plaintiff also notes that RRI Defendants "have not identified a single witness who would be subject to compulsory process in the Eastern District of Michigan who is not willing to testify [] in Ohio." (ECF No. 24 at 28).

This Court has analyzed this factor in another hotel sex trafficking case, observing that there is "no guarantee that non-party witnesses will be located at the scene of their trafficking" when "years have passed since [plaintiffs] were trafficked." *See In re Hotel TVPRA Litig.*, No. 2:22-CV-1924, 2023 WL 3075851, at *18–19 (S.D. Ohio Apr. 25, 2023) [hereinafter *HTL*] (citing *L.G. v. Red Roof Inns, Inc.*, No. 2:22-CV-1924, 2022 WL 4091837, at *4 (S.D. Ohio Sept. 7, 2022)).  Additionally, regardless of where this litigation is brought, "there is no guarantee that

non-party witnesses will be present or respond to subpoena." *See HTL*, 2023 WL 3075851, at *18–19; *L.G.*, 2022 WL 4091837, at *4 (explaining that alleged sex traffickers are unlikely to appear at trial regardless of subpoena). And because "Red Roof has its principal place of business in the Southern District of Ohio," transfer would not necessarily make litigation more convenient, as it would still "inconvenience [RRI] Defendants by requiring their executive witnesses to travel . . . ." *HTL,* 2023 WL 3075851, at *18. Because the proposed transferee court is likely to pose the same level of inconvenience, this factor thus weighs against transfer.

### b. *Locus of Operative Facts and Access to Proof*

Defendants argue that the key actions and events here, the alleged trafficking, took place in Michigan and thus "any physical evidence—including the premise itself, is in . . . Michigan—not Ohio." (*See* ECF No. 20 at 14). In support, RRI Defendants cite *Mooney v. Genzyme Corp.*, a case filed in the Southern District of Ohio by two Ohio-based plaintiffs who brought product liability claims against a Massachusetts-based company after ingesting an allegedly contaminated substance in Ohio. *See* No. 1:19-CV-791, 2020 WL 3839904 (S.D. Ohio July 8, 2020). Transferring the case to the District of Massachusetts, the *Mooney* court reasoned that the alleged actions that caused the contamination and the alleged cover-up of that contamination had occurred in Massachusetts. *Id*. at *3.

Unlike *Mooney,* however, Plaintiff here specifically alleges that a significant portion of the RRI Defendants' wrongful conduct took place in Ohio. For example, she alleges that "RRI Defendants participated in a joint venture . . . from a central location at the RRI corporate offices in New Albany, Ohio, within the Southern District of Ohio." (*See* ECF No. 1 ¶ 22). She elaborates that RRI Defendants "operat[ed] the subject hotel[] from a central location at the RRI corporate offices"; "distributed revenue earned from the subject hotels among themselves from RRI

corporate offices"; "developed policies for the subject hotels from RRI corporate offices"; and "dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio." (*Id.*). As this Court explained when denying transfer in a similar case:

> What occurred at the Defendants' headquarters in New Albany, Ohio, goes to the heart of Plaintiff's Complaint, pointing to Defendants' corporate knowledge and lack of proper training to hamper and detect trafficking on their properties. Plaintiff does not allege that the actual hotel employees were responsible for her trafficking, rather, the employees did not address the clear signs of Plaintiff's trafficking due to improper training and insufficient policies on the corporate level. While Plaintiff's alleged trafficking arose in Maryland and Michigan, the claim at issue arises in Ohio, based on Plaintiff's assertion that Defendants have corporate knowledge of the training and policies related to trafficking.

*See L.G.*, 2022 WL 4091837, at *4. Indeed, where the allegations revolve around sex trafficking and corporate policies to ignore said sex trafficking, this Court routinely finds allegations of a "generalized inconvenience—that the alleged trafficking took place at hotel locations in [another District], and therefore, relevant documents and witnesses will be located there—and not 'a specific hardship.'" *See Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *4 (S.D. Ohio Mar. 16, 2020); *A.C. v. Red Roof Inns, Inc.*, No. 2:19-CV-4965, 2020 WL 3256261, at *3 (S.D. Ohio June 16, 2020).

Franchisee nonetheless argues that, because RRI Defendants are not the only defendants here, this case is distinguishable from those in which this Court denied transfer. Specifically, Franchisee cites relies on *HTL*, 2023 WL 3075851, for the proposition that venue in this district is proper only if "[Plaintiff] was trafficked in the Southern District of Ohio." (ECF No. 37 at 4). That reading mischaracterizes this Court's ruling. In *HTL*, this Court considered 35 cases alleging similar TVPRA violations against various hotel defendants. The defendants sought to change

venue, and, in its discretion, this Court transferred six cases because the Southern District of Ohio was neither the site of the alleged trafficking, nor the headquarters where the corporate decision-making connected to the alleged trafficking took place. *See HTL*, 2023 WL 3075851, at *20–22. As such, this Court concluded it lacked personal jurisdiction over certain hotel defendants, rendering venue improper, explaining:

> [B]ecause the trafficking alleged in these claims occurred outside of the Southern District of Ohio, Eastern Division, *and* these defendants were not incorporated nor have their principal places of business in the Southern District of Ohio . . . . venue cannot be proper under § 1391(b)(2) in the Southern District of Ohio, but it could be proper in the districts where Plaintiffs were trafficked or where the corporation defendants are "at home."

*HTL*, 2023 WL 3075851, at *11 (emphasis added). Although Plaintiff's trafficking occurred outside the district, the harm she alleges stemmed from decisions and policies that RRI Defendants issued "from a central location at the RRI corporate offices in New Albany, Ohio." (ECF No. 1 ¶ 22). Her claims against Franchisee likewise arose out of the "Franchisee's contacts with Ohio through Franchisee's relationship with the RRI [] Defendants." (*Id.* ¶ 23). Given RRI Defendants' presence in this district, this Court routinely permits similar claims against them to proceed here, even if the alleged trafficking took place elsewhere. *See G.M. v. Choice Hotels Int'l, Inc.*, 725 F. Supp. 3d 766, 775 (S.D. Ohio 2024); *K.F. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-3839, 2024 WL 1256052, at *5 (S.D. Ohio Mar. 25, 2024); *T.D.P. v. Choice Hotels Int'l, Inc.*, 725 F. Supp. 3d 784, 793 (S.D. Ohio 2024).

Nor would it be too burdensome to transfer any records that allegedly exist in Michigan to Ohio. *See Am. S.S. Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) ("[L]ocation of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."), *aff'd*, 599 F.3d 102 (2d Cir. 2010). Without "identifying some documentary evidence that would be unavailable in this district or is

too bulky or difficult to transport, this factor matters little." *Doe S.W.*, 2020 WL 1244192, at *4. Because "[t]he documents and information related to Defendants' alleged corporate knowledge are in Ohio, [] transferring this case to [Michigan] would merely shift the inconvenience." *L.G.*, 2022 WL 4091837, at *4.

Defendants have therefore not demonstrated that this factor "clearly favor[s] a change of venue." *See Doe S.W.*, 2020 WL 1244192, at *1–*3 (quoting *MJR Int'l, Inc. v. Am. Arb. Ass'n,* No. 2:06-cv-0937, 2007 WL 2781669, at *3 (S.D. Ohio Sept. 24, 2007)). This factor therefore slightly weighs against transfer.

### c. *Plaintiff's Choice of Forum*

Plaintiff—a Michigan resident—chose to file this lawsuit in the Southern District of Ohio. Typically, "'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Reese*, 574 F.3d at 320 (quoting *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 612 (6th Cir. 1984)); *see also Helmer v. Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.*, No. 1:20-CV-105, 2020 WL 5250435, at *5 (S.D. Ohio Sept. 3, 2020) ("A plaintiff's choice of venue . . . holds great weight and should only be disturbed upon a significant showing that the public and private interests at stake weigh in favor of transfer."). That said, where "'the cause of action has little connection with the chosen forum," a plaintiff's choice of forum is given less weight than such choice would be given otherwise." *DRFP, LLC v. Republica Bolivariana De Venez*, 945 F. Supp. 2d 890, 902-03 (S.D. Ohio 2013) (internal quotation marks and citation omitted).

RRI Defendants argue that Plaintiff's choice of forum is a neutral factor because Plaintiff is a Michigan resident. (ECF No. 20 at 16–17). But RRI Defendants fail to demonstrate that there is "*no* connection between the events at issue and this district." *Cf. Tanyike*, 603 F. Supp. 3d at 581

(emphasis added). As this Court explained above and in other cases, the executive decision-making relevant to Plaintiff's TVPRA claims occurred at RRI's headquarters in New Albany, Ohio. *See L.G.*, 2022 WL 4091837, at *4 ("What occurred at the Defendants' headquarters in New Albany, Ohio, goes to the heart of Plaintiff's Complaint, pointing to Defendants' corporate knowledge and lack of proper training to hamper and detect trafficking on their properties."); *HTL*, 2023 WL 3075851, at *20 (recognizing that location of "Red Roof's executive decision-making would likely be at their headquarters in New Albany, Ohio.").

Accordingly, Plaintiff's choice of forum weighs against transfer.

### 2. Public Interest Factors

The public interest to be considered under § 1404(a) includes "[d]ocket congestion, the burden of trial to a jurisdiction with no relation to the cause of action, the value of holding trial in a community where the public affected live, and the familiarity of the court with controlling law." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 945 (S.D. Ohio 2002) (citing *Gulf Oil*, 330 U.S. at 508). RRI Defendants argue that trial in Ohio would be burdensome given that the incident occurred in Michigan, involving Michigan staff, Michigan law enforcement, along with out-of-state traffickers and a non-resident. (ECF No. 20. at 15). They also assert that the community affected by the trial is Michigan, and Michigan is the community that has familiarity with the Madison RRI, not Ohio. (*Id.*).

These arguments, however, again ignore Plaintiff's focus on RRI Defendants' policies, procedures, and management practices, as decreed from RRI corporate headquarters in New Albany, Ohio. (*See* ECF No. 1 ¶ 60 ("Sex trafficking was a brand-wide problem for RRI originating from management level decisions at their corporate offices in Ohio."). When a company is incorporated in a state, there can be a compelling public interest in deciding a controversy

involving that company at home. *North v. McNamara*, 47 F. Supp. 3d 635, 648 (S.D. Ohio 2014); *see L.G.*, 2022 WL 4091837, at *4.

Although they recognize that "[t]he Southern District of Ohio, and specifically this Judge, has more than 30 pending TVPRA cases," RRI Defendants nonetheless maintain that "[b]oth jurisdictions are familiar with the controlling law" and note that the Eastern District of Michigan has "seen multiple TVPRA cases." (ECF No. 20 at 16 n. 2). Plaintiff, on the other hand, contends that "maintaining a centralized venue for a docket of human trafficking cases filed against RRI Defendants under the TVPRA" in this district weighs against transfer, as does Ohio's "important interest in regulating the conduct of RRI Defendants who have their principal place of business here and who allegedly engaged in corporate wrongdoing here." (ECF No. 24 at 34–35). Plaintiff also cites this Court's expertise "in applying the TVPRA in the hospitality context" and rejects RRI Defendants' suggestion—"that the District Court of Michigan has equal experience"—as "unfounded." (*Id*. at 35).

As Plaintiff correctly points out, several pending cases in the Southern District of Ohio are related to this matter, which this Court has managed for years. Trying this case in this district would thus promote judicial economy, systemic integrity, and fairness. *See DRFP*, 945 F. Supp. 2d at 903 ("[T]he Court finds that—considering efficiency and other practical concerns—[other] factors are balanced, if not outweighed, by the fact that this Court has already gained extensive experience and familiarity with this action."). As another court in this Circuit noted, "having [] related litigation moving on a potentially conflicting track in a different district" frustrates the administration of justice. *Sacklow v. Saks Inc.*, 377 F. Supp. 3d 870, 881 (M.D. Tenn. 2019); *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases

involving precisely the same issues are simultaneously pending in different [d]istrict [c]ourts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent.").

Accordingly, the public interest factors weigh against transfer. *See L.G.*, 2022 WL 4091837, at *4.

* * * *

RRI Defendants fail to show that the relevant factors are "strongly in favor of a transfer," *First Bank of Marietta v. Bright Banc Sav. Assoc.*, 711 F. Supp. 893, 896–97 (S.D. Ohio 1988), or identify any jurisdictional or venue deficiencies to justify transfer, *HTL*, 2023 WL 3075851, at *21. This Court therefore **DENIES** Defendants' motions to transfer. (ECF Nos. 20, 37). Additionally, because this Court does not rely on any authority contained in Plaintiff's notice of supplemental authority (ECF No. 28), RRI Defendants' motion for leave to oppose the notice is **DENIED AS MOOT**. (ECF No. 33).

### B. Motion to Dismiss

RRI Defendants argue that Plaintiff's TVPRA claims should be dismissed because: (1) the claims are barred by the TVPRA's 10-year statute of limitations; and (2) Plaintiff's allegations fail to support a plausible TVPRA claim. This Court addresses each argument in turn.

#### 1. Statute of Limitations

The TVPRA requires that a claim be "commenced not later than . . . 10 years after the cause of action arose." 18 U.S.C. § 1595(c)(1). The Sixth Circuit has recognized that Rule 12(b)(6) is "generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations," unless the allegations affirmatively show a claim is time-barred. *Cataldo v. United States Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). This is because the statute of limitations is an affirmative defense, *see* Fed. R. Civ. P. 8(c), and a plaintiff "generally need not plead the lack of affirmative

defenses to state a valid claim." *Cataldo,* 676 F.3d at 547 (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). But where "the allegations in the complaint affirmatively show that the claim is time-barred," dismissal under Rule 12(b)(6) is appropriate. *Id.* (citing *Jones*, 549 U.S. at 215); *see Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 743 (S.D. Ohio 2020) ("A motion to dismiss based on the statute of limitations . . . can be granted only where the defense appears valid from the face of the Complaint alone.").

RRI Defendants contend that Plaintiff's claims are untimely because the alleged trafficking at the Madison RRI occurred between 2013 and January 31, 2014, but Plaintiff "did not bring a claim for any of these trafficking incidents until January 31, 2024." (ECF No. 20 at 17–18). Plaintiff maintains that she brought her claims "within 10 years after the last date of her trafficking." (ECF No. 24 at 23). According to Plaintiff, she "had no obligation to plead around" the statute of limitations. (*Id.*). But even if the statute of limitations bars any portion of her claims, she argues that equitable tolling principles forestall the expiration of the limitations period.

Because Plaintiff's allegations do not affirmatively show that her claims are time-barred, dismissal on statute-of-limitations grounds is inappropriate. *See Cataldo*, 676 F.3d at 547. In other contexts, the statute of limitations begins to run "when a plaintiff has a complete and present cause of action [and] can file suit and obtain relief" or "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, No. 1:08-CV-346, 2015 WL 759849, at *5 (S.D. Ohio Feb. 23, 2015), *aff'd*, 839 F.3d 458 (6th Cir. 2016) (internal citations and quotation marks omitted) (explaining when a cause of action accrues for constitutional claims). But as this Court held in a similar case, Plaintiff's TVPRA claims are "precisely the sort to which the 'continuing violation' doctrine should apply," such that "the statute of limitations does not begin to run until the pattern of wrongful conduct has

concluded." *See S.R. v. Wyndham Hotels & Resorts, Inc.*, No. 2:23-CV-1731, 2024 WL 3226126, at *2 (S.D. Ohio June 28, 2024).

A continuing violation exists if: "(1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Broom v. Strickland*, 579 F.3d 553, 555 (6th Cir. 2009) (quoting *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009)). Because Plaintiff's trafficking "injury arises from a 'numerous and continuous series of events' that extends into the statutory period," the continuing violation doctrine permits her "'to reach back to the beginning of a claim even if that beginning lies outside of the statutory period.'" *S.R.*, 2024 WL 3226126, at *2 (quoting *Ali v. Khan*, 336 F. Supp. 3d 901, 910 (N.D. Ill. 2018) (internal citations omitted) (applying the continuing violation doctrine to a TVPRA claim)).

Additionally, Plaintiff's allegations that she was under the continuous control and coercion of her traffickers through at least 2016, (ECF No. 1 ¶¶ 30, 129), are sufficient to support an inference that any failure on her part "to meet the legally-mandated deadline unavoidably arose from circumstances beyond [] [her] control." *Graham-Humphreys v. Memphis Brooks Museum*, 209 F.3d 552, 560-61 (6th Cir. 2000). Questions about timeliness are therefore better left for summary judgment (or ultimately trial), when this Court can evaluate compliance with the statute of limitations on a more complete factual record. *See E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 432 (N.D. Tex. 2021) (concluding that "whether the statute of limitations should be tolled involves fact questions that are better resolved at summary judgment," where plaintiff argued "that the statute of limitations for her claim is tolled due to the force and coercion Plaintiff underwent by her trafficker"); *Franco v. Diaz*, 51 F. Supp. 3d 235, 248 (E.D.N.Y. 2014) ("[W]hen plaintiffs raise an equitable tolling argument, a court must deny a motion to dismiss based on the statute of

limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled." (alteration in original) (quoting *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009))).

This Court therefore declines to dismiss Plaintiff's claims as time-barred.

### 2. Sufficiency of TVPRA claims

RRI Defendants also challenge the sufficiency of Plaintiff's allegations to state a plausible claim for liability under the TVPRA's civil provision, 18 U.S.C. § 1595. That provision provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). As the statutory text makes clear, Section 1595 creates two kinds of civil liability: perpetrator liability and beneficiary (or participant) liability. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552–53 (7th Cir. 2023). To establish a "violation of this chapter" under Section 1595(a), sex trafficking victims look to 18 U.S.C. § 1591, the provision of the TVPRA that sets forth criminal penalties for sex trafficking. Section 1591 provides:

> (a) Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years

>and will be caused to engage in a commercial sex act, shall be punished as
>provided in subsection (b).

18 U.S.C. § 1591(a).

Because Plaintiff seeks to hold RRI Defendants directly and vicariously liable for TVPRA violations under both a beneficiary theory and perpetrator theory, this Court proceeds by first assessing Plaintiff's direct liability claim under the perpetrator theory; then her direct liability claim under the beneficiary theory; and, finally, her indirect liability claim.

### a.  Direct Liability

Having extensively analyzed the civil liability of hotel defendants in TVPRA sex trafficking cases, *see S.R.*, 2024 WL 3226126, at *2 (collecting cases), this Court begins—as always—by noting that a civil claim under Section 1595(a) can be a standalone claim, and defendants need not have committed the underlying criminal sex trafficking offense under Section 1591 for a plaintiff to maintain an action under Section 1595(a). *See M.A. v. Wyndham Hotels & Resorts, Inc*., 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019); *G.G.*, 76 F.4th at 553 n.4 ("Courts unanimously agree that a civil defendant under Section 1595 need not have violated Section 1591."). Additionally, Plaintiff's allegation that she is a victim of sex trafficking within the meaning of § 1591 (ECF No. 1 ¶¶ 116, 119) is sufficient, at the pleading stage, to establish that she is a "victim of a violation of this chapter" under 18 U.S.C. § 1595(a).

### (1) Perpetrator Liability

Plaintiff's first cause of action asserts that Defendants are liable as "perpetrators" of 18 U.S.C §1591(a) violations. (ECF No. 1 ¶¶ 116–18). To survive dismissal on this claim, the Complaint must plausibly allege that RRI Defendants knowingly and in interstate or foreign commerce either: (a) recruited, enticed, harbored, transported, provided, obtained, maintained,

patronized, or solicited a person; or (b) benefitted from knowingly assisting, supporting, or facilitating, the recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting of a person. 18 U.S.C. § 1591. Plaintiff must also plead sufficient facts to support RRI Defendants' *actual knowledge* "that means of force, threats of force, fraud . . . or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591. As this Court recognized in *M.A.*, Section 1591's knowledge standard is much higher than the "should have known" standard required for beneficiary liability. *M.A.*, 425 F. Supp. 3d at 966; *see also Acevedo v. Exp. Realty, LLC*, 713 F. Supp. 3d 740, 764–65 (C.D. Cal. 2024).

RRI Defendants argue that the Complaint fails to allege that they had "actual knowledge" of J.N.K.'s trafficking. Plaintiff retorts that her allegations "support an inference that Franchisee, hotel staff and management had actual knowledge of, or at least were willfully blind to the trafficking at the [Madison] RRI and yet participated in harboring her and facilitating her trafficking." (ECF No. 24 at 22 n. 19). Specifically, Plaintiff points to the following portions of the Complaint:

> 75. Based upon information and belief, multiple employees at the RRI, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

> 76. As such, Defendants knew or were willfully blind to the fact that Jane Doe (J.N.K.) was being trafficked at the subject RRI property.

> 77. Given these obvious signs, RRI Brand Defendants knew or should have known about the trafficking of Jane Doe (J.N.K.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

> 117. Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they . . . violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe

> (J.N.K.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

(ECF No. 1 ¶¶ 75–77, 117)). These allegations, however, hew more closely to legal conclusions than factual allegations. Because this Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 679 (legal conclusions "must be supported by factual allegations"), bare contentions that RRI Defendants *knew* that Plaintiff was being trafficked, without more, is insufficient. The cases Plaintiff cites do not compel a different conclusion.

In *Canosa v. Ziff*, for example, the court held that the plaintiff sufficiently alleged that Harvey Weinstein's "TWC Companies" violated 18 U.S.C. § 1591 by "actively participat[ing] in the recruitment and enticement of women, knowing that those women would—or would likely—be coerced by Weinstein into engaging in what amounted to a commercial sex act with him." No. 18 CIV. 4115 (PAE), 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019). There, the complaint alleged that "the TWC Companies maintained women on their payroll whose responsibilities including introducing Weinstein to young women and covering up his assaults"; "the TWC Companies knew that Weinstein's recurrent practice—indeed, pattern—was to lure women like Canosa into pretextual meetings and then subject them to forced sexual acts[] [but] . . . nevertheless continued to pay for and facilitate Weinstein's interstate and foreign travel, on which trips some assaults, including of [Plaintiff], occurred"; "employees of the TWC Companies gave Weinstein the medications he required to perform sexual acts and cleaned up after his sexual assaults"; and *"*the TWC Companies expressly or tacitly linked tangible job benefits to the commission of the forced sexual advances and sexual assaults aforesaid." *Id.* The facts alleged in *Canosa* therefore directly link the entities and the trafficker in a way that Plaintiff's allegations do not here.

Likewise, in *United States v. Bhimani*, No. CR 3:17-324, 2021 WL 5179196 (M.D. Pa. Nov. 8, 2021), the court upheld the criminal liability of a motel owner and its general manager under the TVPRA based on "ample evidence" showing that the general manager "knowingly rented rooms to drug and sex traffickers, gave discounts, hired drug dealers and users to work at the hotel, did not fire them once they learned about drug activity, allowed criminal guests to check in under assumed names, allowed guests to check in without showing identification, refrained from kicking guests out despite disruptive, criminal behavior, and allowed criminals to stay and work out of their room and pay the room rate with the proceeds." *Id.* at *9. Although Plaintiff here alleges that RRI Defendants and hotel staff were "willfully blind" to her sex trafficking, she fails to allege sufficient facts to support such an inference or other facts that resemble the circumstances in *Bhimani*. The case is of even less import, given that it was a criminal case and the facts there were considered under a different procedural posture.

Finally, *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017), which reversed the dismissal of a TVPRA claim, involved facts that were more overt than what Plaintiff alleges here. There, the complaint alleged that the motel operators had prior commercial dealings with the trafficker and intended to reinstate these dealings for profit "in circumstances in which [the trafficker's] coercive and abusive treatment of [the victim] as a sex slave had become apparent" to the motel operators. *Id.* at 555. The allegations in *Ricchio* included a "high-five" while discussing "getting this thing going again," a past business relationship between the trafficker and hotel owner, and allegations that one of the hotel owners had gone to the victim's room and "had shown indifference to Ricchio's obvious physical deterioration." *Id.* Ricchio alleged that while "in plain daylight view of the front office of the motel," her trafficker "kick[ed] her and force[d] her back toward the rented quarters when she had tried to escape." *Id*. Although Plaintiff contends that RRI Defendants'

23

"familiar[ity]" with the population of traffickers at the hotel and "implicit[] encourage[ment]" of their illegal activities constitute "harboring . . . and knowing facilitation" (ECF No. 24 at 22 n. 19), her allegations "do not rise to the level of obviousness present in *Ricchio*." *See M.A.*, 425 F. Supp. 3d at 966. Nor do the facts alleged "suggest a direct agreement between her trafficker and any of the hotel defendants," or "that a specific hotel staff member saw her in a deteriorated state." *Id.*

Absent any facts to suggest that RRI Defendants possessed actual knowledge of J.N.K.'s trafficking, RRI Defendants cannot be held liable as sex trafficking "perpetrators" under section 1595(a). Accordingly, this Court **GRANTS IN PART** RRI Defendants' motion (ECF No. 20) to the extent it seeks dismissal of Plaintiff's perpetrator liability claim and **DISMISSES** that claim against RRI Defendants.

### (2) Beneficiary Liability

Plaintiff's claim under the TVPRA's beneficiary theory of liability, which does not require actual knowledge, fares better. To survive dismissal on this claim, the Complaint must plausibly allege that: (1) RRI Defendants "knowingly benefitted, financially or by receiving anything of value"; (2) from participating in a venture; [and] (3) that they "knew or should have known [that the venture] engaged in an act in violation of [the TVPRA]." § 1595(a). As this Court noted in *Doe*, "a plaintiff may satisfy these elements by showing that 'defendant's own acts, omissions, and state of mind establish each element.'" *See Doe v. Best W. Int'l, Inc.*, No. 2:23-CV-3459, 2024 WL 3759761, at *4 (S.D. Ohio Aug. 12, 2024) (quoting *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1060 (D. Colo. 2021)).

### i. Knowing Benefit

The "knowing benefit" element merely requires that RRI Defendants knowingly receive a financial benefit, not that RRI Defendants have actual knowledge of an illicit venture. *A.C.*, 2020

WL 3256261, at *4. As this Court found in *M.A.*, "the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *M.A.*, 425 F. Supp. 3d at 965; *accord H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019); *see also J.L.*, 521 F. Supp. 3d at 1061 (concluding that allegations that a hotel defendant received a percentage of room revenue where trafficking occurred, was sufficient to meet the knowing benefit element under 18 U.S.C. § 1595(a)); *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1137 (D. Colo. 2019) (finding that the forced labor provision of § 1589(b) does not "require[ ] the party to benefit from the [forced] labor or services for liability to attach").

Because Plaintiff alleges that RRI Defendants rented rooms to her traffickers and benefited financially from those rentals (ECF No. 1 ¶¶ 86, 90, 108, 109, 116), Plaintiff's allegations are enough to satisfy the element of "knowing benefit" under Section 1595(a).

### ii.    *"Participated in a venture"*

Plaintiff has also alleged sufficient facts to establish that Defendants' conduct constitutes "participation in a venture" under Section 1595(a). As this Court held in *M.A.*, Defendants need not have actual knowledge of the sex trafficking or perform an overt act to have "participated" in a sex trafficking venture for TVPRA liability to attach; "otherwise the 'should have known' language in § 1595(a) would be meaningless." 425 F. Supp. 3d at 971; *see also G.G.*, 76 F.4th 544 (participation under TVPRA's civil remedy provision does not require direct participation, criminal violation of TVPRA, or actual knowledge of criminal wrongdoing); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 937 (D. Or. 2020) (agreeing with this Court's reasoning in *M.A.* that a plaintiff is "not required to allege actual knowledge of a sex trafficking venture or the performance of an overt act in order to sufficiently plead the 'participation in a venture' element

of her § 1595 claim"). Plaintiff, however, "must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *See M.A.*, 425 F. Supp. 3d at 970 (citing *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288–89 (D. Conn. 2013)).

J.N.K.'s allegation here—that RRI Defendants "received increased revenue each time a room was rented at the [Madison] RRI . . . because the payments these defendants received pursuant to their agreement with Mahadeva were primarily determined by gross room revenue"— satisfies the "participation in a venture" element. (*See* ECF No. 1 ¶ 96). Resisting this conclusion, RRI Defendants argue that the "legitimate and routine commercial operations cannot constitute participation in a venture that violates the TVPRA." (ECF No. 20 at 22). In support, they cite the Eleventh Circuit's decisions in *Doe #1 v. Red Roof Inns, Inc.*, 21 F. 4th 714 (11th Cir. 2021) and *K. H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024). In *Doe # 1*, the Eleventh Circuit held that the Section 1595(a) beneficiary claims against hotel franchisors failed because the plaintiffs "provided no plausible allegations that the franchisors took part in the common undertaking of *sex trafficking*." *Doe #1*, 21 F. 4th at 721 (emphasis added). According to the Eleventh Circuit, the Does' allegations "that the franchisors sent inspectors to the hotels who would have seen signs of sex trafficking and that they received reviews mentioning sex work occurring at the hotels" were insufficient because "observing something is not the same as participating in it." *Id. Riti* likewise rejected a similar claim, reiterating that "allegations of financial benefit alone are not sufficient to establish that the defendant participated in a *sex trafficking* venture and observing signs of sex trafficking is not the same as participating in it." *Riti*, 2024 WL 505063, at *4 (emphasis added).

But both *Doe* and *Riti* analyzed plaintiffs' claims that defendants participated in a *sex-trafficking* venture, not the commercial ventures that J.N.K. pleads here. (*See* ECF No. 1 ¶ 99 (explaining the ways in which RRI Defendants engaged in "a commercial venture with other Defendants and with hotel staff"). In *Doe #1*, the Eleventh Circuit recognized that its analysis may have been different if the plaintiffs had pled the hotel franchisor defendants had participated in commercial ventures operating the hotel rather than alleging that they participated in sex-trafficking ventures. 21 F.4th at 727. The *Doe #1* plaintiffs, however, had not done so and had refused an opportunity to amend. *Id*. Thus, neither *Doe #1* nor *Riti* applies to the commercial ventures that J.N.K. pleads here. *See C.T.*, 2023 WL 3510879, at *4 ("Since this case finds itself in waters the Eleventh Circuit declined to wade in, *Doe #1* is not determinative."); *A.R. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-CV-04935, 2022 WL 17741054, at *7 (S.D. Ohio Dec. 16, 2022) (because plaintiff "alleges that Defendant 'participated in a commercial business venture under § 1595[ ] by receiving royalties from Plaintiff's traffickers renting rooms at their branded locations,'" the Eleventh Circuit's decision in *Doe # 1* "is not controlling"). Indeed, both the Eleventh and Seventh Circuits have recognized that the relevant "venture" under Section 1595 need not be "specifically a sex trafficking venture" and can instead be a "commercial venture" like running or expanding a business that facilitates sex trafficking. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (citing *Doe #1*, 21 F.4th at 727).

Because Plaintiff's allegations raise a plausible inference that RRI Defendants participated in hotel-operating commercial ventures that rented rooms to people that RRI Defendants should have known were engaged in sex trafficking, the Complaint satisfies the "participation in a venture" requirement. *See M.A.*, 425 F. Supp. 3d at 968 (defendant who continues an ongoing business relationship with traffickers, including by continuing to rent rooms to them, after the

defendant should know that the business relationship facilitates trafficking, participates in a §1595(a) venture); *A.R.*, 2022 WL 17741054, at *7 (recognizing defendant's "business venture with the franchisee hotels" as sufficient to show participation in a venture under Section 1595); *T.P.*, 2022 WL 17363234, at *11 (recognizing this theory of venture).

### iii. *"Knew or should have known" that the venture violated the TVPRA*

A defendant cannot be liable under 18 U.S.C. § 1595(a) unless it "knew or should have known" that the venture was engaged in sex trafficking. Unlike a perpetrator claim, RRI Defendants need not have actual knowledge of trafficking crimes for beneficiary liability to attach, as the "should have known" language in Section 1595(a) permits constructive knowledge. *M.A.*, 425 F. Supp. 3d at 970 (citing *Jean-Charles*, 937 F. Supp. 2d at 288–89).

RRI Defendants' arguments that Plaintiff fails to satisfy this element are multi-fold. First, they contend that "the 'obvious' signs Plaintiff alleges are not tied to any of the [Madison RRI] employees." (ECF No. 20 at 25). Second, they argue that the signs allegedly observed by employees at the Madison RRI—Plaintiff's trafficker using prepaid cards; condoms or lubricant left in the hotel rooms after check-out; heavy foot traffic in and out of Plaintiff's room; and Plaintiff dressing provocatively—do not "plausibly suggest Defendants knew or should have known Plaintiff was allegedly being trafficked." (*Id.*). "At most," RRI Defendants contend, they are signs of prostitution, not sex trafficking." (*Id.*). Third, RRI Defendants emphasize that "[b]road allegations of sex trafficking in the hotel industry do not allege that these Defendants had knowledge that *this Plaintiff* was subject to trafficking at a particular hotel." (*Id.*). Finally, according to RRI Defendants, Plaintiff cannot establish constructive knowledge "by listing customer reviews and news articles about various Red Roof branded properties not at issue here." (*Id.* at 28).

But RRI Defendants' reading of the Complaint misses key factual allegations. For one, in addition to the signs RRI Defendants reference, Plaintiff also alleges visible indicators of trafficking based on her appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker and hotel staff. She alleges that hotel staff, including at front desk staff and housekeeping, observed that she was emotional, nervous, scared, and often bruised; and that she showed signs of untreated injuries. (*See* ECF No. 1 ¶ 74). These allegations take Plaintiff's claim outside what might constitute consensual commercial sex acts, and into the coerced sex trafficking territory prohibited by the TVPRA. For this reason, and as explained below, the cases on which RRI Defendants rely are not on point and, hence, not controlling.

In *J.B. v. G6 Hosp.,* for example, the plaintiff described instances when she was either in a car in the parking lot or in rented rooms to argue that motel staff "should have been aware" that she was being trafficked. No. 19-CV-07848-HSG, 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020) (emphasis added). The plaintiff, however, had noted that the car windows were covered up and "never allege[d] that she saw or approached employees with or without her trafficker." (*Id.*). Finding the allegations insufficient, the court contrasted the case with *M.A.*, in which the plaintiff alleged that she had "visible physical changes, such as bruising, . . . and that [d]espite her desperate pleas and screams for help, after being beaten or choked at the Defendants' hotel properties, the hotel staff ignored her . . . ." *M.A.*, 425 F. Supp. 3d at 962. Although a plaintiff need not allege facts as egregious as *M.A.* to state a claim, the court in *J.B.* noted that "allegations that the victim sought help and was seen by employees with physical injuries or other facts suggesting coercion allow courts to infer that motel or hotel employees should have known that human trafficking was occurring, as opposed to other criminal conduct, such as prostitution." *J.B.*, 2020 WL 4901196, at *10.

Likewise, in *A.B. v. Hilton Worldwide Holdings Inc.*, the court acknowledged that "factual allegations listing indicia of trafficking (i.e., condition of the hotel room, frequent male visitors) may support a theory that a hotel where Plaintiff was trafficked knew or should have known of Plaintiff's trafficking." 484 F. Supp. 3d at 938–39. But because the plaintiff there "merely allege[d] that she repeatedly 'encountered' the same hotel staff who paid no attention to her" and did not allege "she had prominent bruises, brandings, or other visible injuries," the allegations could not show that the hotels knew or should have known that the commercial sex was a result of fraud, force, or coercion. *Id.* at 941.

Plaintiff's allegations, to be sure, do cover the broader problem of sex trafficking in the hotel industry. But her allegations go farther. Unlike the plaintiffs in the cases above*.,* J.N.K. alleges that she appeared emotional, nervous, scared, and often bruised when interacting with hotel staff; that there was visible "heavy foot traffic in and out of Jane Doe (J.N.K.)'s room involving men who were not hotel guests"; and that "[h]ousekeeping staff was usually prevented from entering the room." (ECF No. 1 ¶ 74). These allegations are sufficient, at the motion to dismiss stage, to suggest that RRI staff should have known that Plaintiff was being sex trafficked. Plaintiff also alleges sufficient facts to impute the constructive knowledge of on-the-ground hotel staff to RRI Defendants by way of direct, day-to-day control through, among other things, RRI Defendants' monitoring of the premises; imposing robust reporting and recordkeeping requirements; controlling "a fully integrated database" that franchised hotels must use to access customer data, reservations, and other information; mandating specific training for Franchisee and hotel management at franchised hotels; mandating on-site training for hotel staff at franchised hotels; controlling channels for guests to report complaints; and retaining the ability to require all franchised hotels to participate in centralized operational services. (*See* ECF No. 1 ¶¶ 101–104).

This Court has previously held that a defendant's notice of "the prevalence of sex trafficking generally at their hotels," the failure "to take adequate steps to train staff in order to prevent its occurrence," and signs that "should have alerted staff to [Plaintiff's] situation" meet the constructive knowledge requirement. *M.A.,* 425 F. Supp. 3d at 968. In comparable environments, this Court has also rejected arguments that hotel defendants "must have had knowledge or constructive knowledge with respect to Plaintiff specifically and that a generalized awareness of sex trafficking in its low-cost hotels is insufficient." *See T.D.P.*, 725 F. Supp. 3d at 798–99. As this Court reasoned in *T.D.P.*, "the express terms of [18 U.S.C. § 1595] impose liability for benefiting from a venture that the Defendant knew or should have known was engaged in violations of § 1591, not violations of § 1591 with respect to a particular person." *Id.*

In the context of the other facts alleged in the complaint, Plaintiff's allegations are sufficient to support a plausible claim under the TVPRA's beneficiary theory. While, ultimately, these allegations may be unsubstantiated on a fuller record, they satisfy the three-pronged requirement of 18 U.S.C. § 1595 to survive a motion to dismiss. *See M.A.,* 425 F. Supp. 3d at 971–72 (denying motion to dismiss of hotel parent company defendants where plaintiff pled that defendants controlled employee training, room pricing, provided online booking platform, and conducted inspections); *T.D.P.*, 725 F. Supp. 3d at 798–99 (same).

This Court therefore **DENIES** RRI Defendants' motion (ECF No. 20) to the extent it seeks dismissal of Plaintiff's beneficiary claim.

### b. *Indirect Liability*

Plaintiff's third and final cause of action asserts that, in addition to direct liability, RRI Defendants are also indirectly liable for TVPRA violations under theories of vicarious liability, specifically as they pertain to joint venture, alter ego, and agency. (*See* ECF No. 1 ¶¶ 123–128).

RRI Defendants urge dismissal of Plaintiff's vicarious liability claim for two reasons, although neither is persuasive.

### (1) Vicarious Liability under the TVPRA

RRI Defendants argue that "vicarious liability is not a viable theory under the TVPRA," because the statute "predicates liability on a defendant's personal knowledge and individual participation in a venture," which "represents a 'clear and explicit' choice to forgo common law indirect liability principles." (ECF No. 20 at 30). But although the TVPRA does not address the issue of indirect or vicarious liability, this Court is guided by "the rule of statutory construction [] that statutes are to be interpreted with reference to the common law and generally be given their common law meaning absent some indication to the contrary." *See United States v. Monasterski*, 567 F.2d 677, 682 (6th Cir. 1977) (citing *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952); *Thomas v. United States*, 189 F.2d 494, 501 (6th Cir.), *cert. den.* 342 U.S. 850 (1951))*; see Meyer v. Holley,* 537 U.S. 280, 285–86 (2003) ("[T]he Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules.").

For this reason, federal courts adjudicating this issue routinely rely on common law to fill in the gaps. *See T.D.P.*, 725 F. Supp. 3d at 799 ("A plaintiff can also satisfy the elements of § 1595's beneficiary theory by imputing to the defendant the acts, omissions, and state of mind of an agent of the defendant through indirect or vicarious liability." (citation and internal quotation marks omitted)); *Treminio v. Crowley Mar. Corp.*, 649 F. Supp. 3d 1223, 1232 (M.D. Fla. 2023) ("Upon review of the relevant authority, the Court declines to find that the TVPRA precludes vicarious liability."); *J.L.*, 521 F. Supp. 3d at 1064–65 ("While the TVPRA is silent on the issue of indirect

liability, numerous district courts have rejected the argument that the TVPRA does not permit agency liability.").

The Sixth Circuit, to be sure, "has yet to rule on whether the federal or state common law of vicarious liability should be applied under the TVPRA." *See T.D.P.*, 725 F. Supp. 3d at 799. Nonetheless, district courts have applied both state and federal common law of vicarious liability to assess indirect liability claims under the TVPRA. *See e.g.*, *A.B. v. Marriott Intern., Inc.*, 455 F. Supp. 3d 171, 194–95 (E.D. Pa. 2020) (applying Pennsylvania agency law); *S.J.*, 473 F. Supp. 3d at 158–59 (applying New York agency law); *Doe by Doe v. Piraino*, 688 F. Supp. 3d 635, 652 (M.D. Tenn. 2023) ("Federal common law agency principles apply to [TVPRA] claims."); *J.L.*, 521 F. Supp. 3d at 1064 ("Because the TVPRA is silent [on the issue of indirect liability], courts have held that the federal common law of agency should apply."); *A.B.*, 484 F. Supp. 3d at 939 ("examin[ing] vicarious liability as a question of federal common law."); *see also S.C. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 771, 778 (N.D. Ohio 2024) ("Courts split on whether to apply federal common law or state law. But either choice leads to the same outcome."); *K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 649 (E.D. Mich. 2024) ("find[ing] that the analysis is largely the same under federal common law and Michigan law and, as such, will . . . apply Michigan common law")

In *M.A.*, the seminal case charging hotel defendants with sex trafficking violations of the TVPRA, this Court analyzed vicarious liability under Ohio common law—a decision that "stemmed from the fact that the limited references to the federal common law of vicarious liability drew directly from Ohio common law and Restatements." *See A.R. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-CV-04935, 2022 WL 17741054, at *8 (S.D. Ohio Dec. 16, 2022) (citing *M.A.*, 425 F. Supp. 3d. at 971–72). Since *M.A.* was decided, however, a growing body of case law has

emerged to suggest that the TVPRA's silence on the issue of vicarious liability supports applying federal common law. *See Piraino*, 688 F. Supp. 3d at 652; *A.B.*, 484 F. Supp. 3d at 939; *J.L.*, 521 F. Supp. 3d at 1064; *Doe (K.E.C.) v. G6 Hosp., LLC*, ___ F. Supp. 3d ___, 2024 WL 4501095, at *12 (E.D. Tex. Sept. 24, 2024); *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235-FL, 2024 WL 4204906, at *8 (E.D.N.C. Sept. 16, 2024) ("Courts evaluating federal statutory claims, including under the TVPRA, generally draw upon the federal common law of agency."); *Doe v. Wyndham Hotels & Resorts*, No. 8:23-cv-1554, 2023 WL 8888836, at *6 (C.D. Cal. Nov. 13, 2023); *A.D. v. Wyndham Hotels & Resorts, Inc.*, No. 4:19cv120, 2020 WL 9550005, at *3 (E.D. Va. Sept. 21, 2020) (same); *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 3035794, at *1 (N.D. Cal. June 5, 2020) ("[T]he TVPRA is silent on the issue of indirect liability, which suggests that the federal common law of agency should apply."). In more recent rulings, this Court has therefore applied federal common law to vicarious liability claims under the TVPRA, explaining that this approach "brings the analysis in line with the Sixth Circuit's approach to applying the federal common law of vicarious liability to federal statutes that do not expressly provide direction on vicarious liability arguments." *See A.M.*, 728 F. Supp. 3d 787, 802 (S.D. Ohio 2024); *G.M.*, 725 F. Supp. 3d at 782; *T.D.P.*, 725 F. Supp. 3d at 799. Moreover, "because there is little to no substantive difference between federal and Ohio common law standards for agency and joint employer vicarious liability," the analysis "under both federal and state common law results in the same outcome." *A.R.*, 2022 WL 17741054, at *8.

Seeking to circumvent these well-settled principles, RRI Defendants urge this Court to adopt the position in *Doe v. Varsity Brands, LLC*, No. 1:22-CV-02139, 2023 WL 4931929 (N.D. Ohio Aug. 2, 2023), which held that 18 U.S.C. § 2255—the section of the Child Abuse Victims' Rights Act ("CAVRA") that provides a civil cause of action for certain enumerated crimes—does

not provide for secondary liability. (*See* ECF No. 20 at 31 (citing *Varsity Brands*, 2023 WL 4931929, at *7-8)). But like other federal courts assessing indirect liability claims under CAVRA, this Court analyzed the statutory text and found "no reason to believe that Congress intended to prohibit plaintiffs from suing beneficiaries of and participants in the many crimes enumerated in [18 U.S.C.] § 2255." *See T.D.P.*, 725 F. Supp. 3d at 791; *see also Jane Doe No. 8 v. Royal Caribbean Cruises, Ltd.*, 860 F. Supp. 2d 1337, 1339 (S.D. Fla. 2012) (concluding that a cruise line could be held liable under 18 U.S.C. § 2255 for the sexual crimes of its employees).

Because this Court holds that the TVPRA allows for vicarious liability, RRI Defendants' motion to dismiss Plaintiff's claim on this basis must be rejected.

### *(2) Principal-Agency Liability*

RRI Defendants' second argument challenges the sufficiency of Plaintiff's allegations to support an agency relationship. "To succeed under an agency theory, Plaintiff must show both: (1) that Defendant and its franchisee[] were in an agency relationship; and (2) that [the franchisee] hotel[] or hotel staff are plausibly liable under § 1595(a)." *A.M. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 787, 803 (S.D. Ohio 2024), *partially amended on reconsideration on other grounds sub nom. In re Hotel TVPRA Litig.*, No. 2:21-CV-4933, 2024 WL 4945135 (S.D. Ohio Dec. 3, 2024).

### *i.  Agency Relationship*

The Sixth Circuit looks to the Restatement of Agency when applying "federal common law principles of agency." *See Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 586 (S.D. Ohio 2016). An agency relationship exists when a principal "manifests assent" to an agent "that the agent shall act on the principal's behalf and subject to the *principal's* control, and the agent manifests assent or otherwise consents so to act." *See* Restatement (Third) of Agency, § 1.01

(2006) (emphasis added). A defining element of agency "is the principal's right to control the agent's actions," such as "[t]he power to give interim instructions." Restatement (Third) of Agency § 1.01 cmt. f (explaining that "[t]he power to give interim instructions" is what "distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents"); *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) ("An essential element of agency is the principal's right to control the agent's actions." (internal quotation marks and citations omitted)). In determining whether an agency relationship exists, the question is "how much the agent 'retained control, or the right to control, the mode and manner of doing the work contracted for.'" *M.A.*, 425 F. Supp. 3d at 971–72 (quoting *Beddia v. Goodin*, 957 F.2d 254, 257 (6th Cir. 1992) (citation omitted)).

Generally, the existence and extent of the agency relationship is a question of fact that is better addressed later in the proceedings. *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 661 (6th Cir. 2005) ("Given that the existence of an agency relationship is a question of fact, rather than one of law, . . . the court should have denied [the defendant's] motion if any conflicting evidence of an agency relationship between plaintiffs and [the defendant] was presented."). Nonetheless, a plaintiff must still set forth plausible allegations that an agency relationship exists for her claim to survive a Rule 12(b)(6) motion. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990) ("It is . . . clear that the plaintiff bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship."); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1258 (M.D. Fla. 2020) ("Plaintiffs . . . do not need to prove an agency relationship at this stage, but simply set forth plausible allegations that one exists . . . ." (citations omitted)).

While the mere existence of a franchise does not establish an agency relationship, the franchise model does not preclude wholesale franchisors from vicarious liability under an agency theory. *Bricker v. R & A Pizza, Inc.*, 804 F. Supp. 2d 615, 623 (S.D. Ohio 2011) ("[T]he existence of a franchisor-franchisee relationship between persons does not in itself preclude the existence of a principal-agent relationship between them." (internal quotation marks and citations omitted)). To determine whether "a principal-agent relationship exists, courts consider the same factors 'as in the absence of a franchisor-franchisee relationship.'" *Bricker*, 804 F. Supp. 2d at 623 (quoting *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416 (S.D. Ohio 1986)). Accordingly, franchisor hotels may be held vicariously liable under an agency theory for the wrongful acts of their franchisees, or franchisees' employees, when the hotel franchisor has direct control of, or the right to control, the day-to-day operations of the franchisee. *See A.M.*, 728 F. Supp. 3d at 803.

Taken as true, the Complaint plausibly alleges an agency relationship between RRI Defendants and Franchisee. Plaintiff alleges that RRI Defendants exercised day-to-day control over the Madison RRI by: (1) controlling all details of the guest reservation, check-in, and payment processes through management of and control over all systems used for those processes; (2) controlling room prices, discounts, and reward programs; (3) requiring franchisees to use centralized property management systems for their operations; (4) collecting reservation, payment, and occupancy data through a fully integrated database maintained by RRI Defendants; (5) regularly inspecting RRI branded properties; (6) controlling all marketing and facility designs for RRI branded properties; (7) requiring use of standardized training methods for employees; (8) mandating specific training for Franchisee and hotel management at franchised hotels; and (9) providing benefits to employees of franchised properties; (10) adopting and enforcing detailed policies dictating the means and methods used for day-to-day operations; and (11) dictating,

supervising, and overseeing policies and protocols regarding detecting and responding to human trafficking. (*See* ECF No. 1 ¶¶ 89–93, 103).

These allegations satisfy the pleading standards of Federal Rule of Civil Procedure 8 to demonstrate RRI Defendants' control over Franchisee for purposes of an agency relationship. *See Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at \*7–8 (S.D. Ohio Mar. 16, 2020) (finding allegations of "profit sharing, standardized training methods, building specifications, standardized rules of operation, regular inspection of the facility, and price fixing" sufficient to support agency relationship between franchisor and franchisee hotel); *A.B.*, 484 F. Supp. 3d at 940 (finding similar allegations sufficient to plead an agency relationship under federal common law but dismissing indirect liability claim on other grounds).

### ii. *Franchisee's Liability*

Plaintiff's allegations also satisfy the second requirement to succeed on her agency theory—that the Franchisee itself committed a wrong that can be imputed on RRI Defendants. *See A.M.*, 728 F. Supp. 3d at 804. This Court applies the three-pronged test established by 18 U.S.C. § 1595, and already used to assess RRI Defendants' direct liability, to Franchisee as well: (1) Franchisee must "knowingly benefit[], financially or by receiving anything of value"; (2) from participating in a venture; (3) that it "knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

First, Plaintiff alleges that the Franchisee financially benefited from renting rooms to traffickers, therefore satisfying the first prong. (ECF No. 1 ¶¶ 96–97). RRI Defendants' contention that the Complaint contains "no allegations" that "any employees 'knowingly benefitted' from a trafficking venture" lacks merit. (*See* ECF No. 20 at 20). As explained in Section III.B.2.a.(2).i

*supra*, the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to satisfy the "knowing benefit" element.

See *M.A.*, 425 F. Supp. 3d at 965 ("[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the [section] 1595(a) standard."). Second, Plaintiff's allegations raise a plausible inference that Franchisee, along with RRI Defendants, participated in a hotel-operating commercial venture that profited from Plaintiff's sex trafficking. (*See* ECF No. 1 ¶ 99). Finally, the Complaint plausibly alleges that Franchisee had constructive knowledge that Plaintiff was being trafficked by observing red flags consistent with sex trafficking, including Plaintiff's bruising, demeanor, movements throughout the hotel, and her interactions with hotel staff. RRI Defendants' contention that the Complaint contains "no allegations" that the "organizations, independent of their employees, had any knowledge of Plaintiff's trafficking," (ECF No. 20 at 20), misunderstands the beneficiary theory of TVPRA civil liability. As explained in Section III.B.2.a.(2).iii *supra*, "actual knowledge" is not required for a plaintiff to hold defendants civilly liable as beneficiaries of her sex trafficking.

To reiterate, Plaintiff's allegations at this stage are just that: allegations. But where more than one inference may be drawn from an allegation, this Court must resolve the conflict in favor of the plaintiff. *Mayer*, 988 F.2d at 638. Because Plaintiff's allegations, viewed most favorably to her, support an agency relationship between RRI Defendants and Franchisee, and Plaintiff adequately alleges Franchisee's liability under the TVPRA's beneficiary theory, RRI Defendants' motion to dismiss the vicarious liability claim is denied.

* * * *

RRI Defendants' motion to dismiss is therefore **GRANTED IN PART** and **DENIED IN PART**; the motion to dismiss is granted with respect to Plaintiff's perpetrator liability claim and **DENIED** as to all other claims.

### IV. CONCLUSION

For the foregoing reasons, this Court **GRANTS IN PART** and **DENIES IN PART** RRI Defendants' motion to transfer venue or, in the alternative, to dismiss. (ECF No. 20). Specifically, RRI Defendants' request to transfer the case to the Eastern District of Michigan is **DENIED**; and their motion to dismiss is **GRANTED** with respect to Plaintiff's perpetrator liability claim and **DENIED** as to all other claims. Additionally, because this Court does not rely on any authority contained in Plaintiff's notice of supplemental authority, RRI Defendants' motion for leave (ECF No. 33) is **DENIED AS MOOT**. Finally, this Court **DENIES** Defendant Mahadeva's motion to transfer venue. (ECF No. 37).

**IT IS SO ORDERED**.

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 11, 2025**